*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0104p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CITIZENS FOR TAX REFORM and JEFFREY P. LEDBETTER,

> *Plaintiffs-Appellees,*

*v.*

JOSEPH DETERS et al.,

> *Defendants,*

STATE OF OHIO,

> *Intervenor Defendant-Appellant.*

No. 07-3031

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 05-00212—Susan J. Dlott, District Judge.

Argued: November 30, 2007

Decided and Filed: March 5, 2008

Before: SILER, GIBBONS, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ARGUED:** William P. Marshall, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellant. David R. Langdon, LANGDON & HARTMAN, Cincinnati, Ohio, for Appellees. **ON BRIEF:** William P. Marshall, Sharon A. Jennings, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellant. David R. Langdon, Curt C. Hartman, LANGDON & HARTMAN, Cincinnati, Ohio, for Appellees. Todd P. Graves, GRAVES, BARTLE & MARCUS, Kansas City, Missouri, for Amicus Curiae.

1

---

**OPINION**

---

McKEAGUE, Circuit Judge.  As with the law in general,[1] the First Amendment is a jealous mistress.  It enables the people to exchange ideas (popular and unpopular alike), to assemble with the hope of changing minds, and to alter or preserve how we govern ourselves.  But in return, it demands that sometimes seemingly reasonable measures enacted by our governments give way.

The State of Ohio enacted a provision making it a felony to pay anyone for gathering signatures on election-related petitions on any basis other than the time worked.  It did so for the sensible purpose of reducing fraudulent signatures.  The provision, however, runs afoul of the First Amendment because it creates a significant burden on a core political speech right that is not narrowly tailored.  Accordingly, we affirm the district court's grant of summary judgment against the State.

**I**

The district court set forth the background of this case:

Ohio Revised Code ("O.R.C.") § 3599.111 ("the Statute") states in relevant part as follows:

(B) No person shall receive compensation on a fee per signature or fee per volume basis for circulating any declaration of candidacy, nominating petition, initiative petition, referendum petition, recall petition, or any other election-related petition that is filed with or transmitted to a board of elections, the office of the secretary of state, or other appropriate public office.

* * *

(D) No person shall pay any other person for collecting signatures on election-related petitions or for registering voters except on the basis of time worked.

Plaintiffs Citizens for Tax Reform ("CTR") and Jeffrey P. Ledbetter, a former Treasurer of CTR,[2] filed a Verified Complaint on April 1, 2005 challenging the constitutionality of the O.R.C. § 3599.111 on the grounds that the prohibition of payment to petition circulators on a per-signature or per-volume basis violated their core political speech rights. (Doc. 1.) Plaintiffs named as defendants Joseph T. Deters, the Hamilton County, Ohio prosecutor, and Mathias H. Heck, Jr., the Montgomery County, Ohio prosecutor, both in their official capacities only, as persons responsible for the enforcement of the Statute. (*Id.*)

Prior to the effective date of the Statute, CTR had engaged a political consulting firm on the basis of a fixed fee contract to secure the necessary signatures

---

[1]*See* Joseph Story, *Inaugural Address as Dane Professor of Law at Harvard University, on the Subject of the Value & Importance of Legal Studies* (Aug. 5, 1829).

[2]Collectively referred to herein as "CTR."

to qualify a proposed constitutional amendment for the November 2005 Ohio general election. Pursuant to the contract, CTR was to pay the firm $1.70 per signature for a total of approximately 450,000 signatures. After the Statute became effective, CTR was not permitted to pay circulators on a per-signature or on any per-volume basis. The political consulting firm was no longer willing to collect signatures pursuant to the agreed-upon fixed-fee contract and it estimated that the cost for gathering the signatures would increase by more than $300,000. Plaintiffs asserted that the Statute increased the cost of qualifying their proposed amendment, made it more difficult to raise money necessary to fund the initiative effort, and that they had refrained from attempting to qualify the proposed amendment for the ballot so long as the Statute was in force. (*Id.*)

The Ohio Attorney General moved to intervene as a defendant in this action on March 11, 2005 in order to defend the constitutionality of § 3599.111 and the Court issued a Notation Order permitting the intervention on March 12, 2005. (Doc. 7.)

On March 19, 2005, Chief Judge Sandra Beckwith issued a Temporary Restraining Order enjoining the enforcement of O.R.C. § 3599.111. (Doc. 16.) Chief Judge Beckwith found that Plaintiffs "have introduced actual evidence that tends to show that the restriction on payment of petition circulators on a per-signature basis limits their ability to retain effective circulators and reduces the likelihood that they will succeed in placing their initiative on the November 2005 ballot." (*Id.* at 9.) She further found that the State of Ohio did not adduce evidence of the necessity of the law to prevent fraud. She stated that the State's evidence that fraud occurred when circulators were paid on a per-signature basis in Ohio was not sufficient to establish that the per-signature basis was cause of or an incentive to the fraud. (*Id.*) The State had not proven "that compensation on a per-signature basis generates fraud at a greater rate than other forms of compensation." (*Id.*)

On May 4, 2005, March 22, 2006, and April 16, 2006, the Court issued Agreed Orders extending the temporary restraining order until October 15, 2005, extending it to cover the amendments to the law that took effect on May 2, 2005, and extending it pending a final disposition in this case. (Docs. 20, 42, 46.)

*Citizens for Tax Reform v. Deters*, 462 F. Supp. 2d 827, 828-30 (S.D. Ohio 2006) ("*CTR*") (footnotes in original omitted).

Deters and Heck moved for summary judgment based on the intervention in the case by the State of Ohio. As CTR did not oppose the motion, the district court granted them summary judgment and dismissed them from the case. *Id.* at 830.

CTR and the State of Ohio filed cross motions for summary judgment. The State also filed a motion to dismiss based on mootness. The district court denied the State's motion to dismiss, concluding that the State had not proven that CTR had disbanded and, even if it had, CTR's case was saved from mootness under the exception for wrongs that are "capable of repetition, yet evading review." *Citizens for Tax Reform v. Deters*, No. 05-212, 2006 WL 3420242, at *1 (S.D. Ohio Nov. 27, 2006).

On the cross motions, the district court held that the Statute was unconstitutional. The district court found that CTR had established that the "Statute burdens their core political speech rights." *CTR*, 462 F. Supp. 2d at 832. Specifically, it agreed with a prior district court judge's issuance of a temporary restraining order in the case based on CTR's showing "that the Statute limits

[its] ability to retain effective circulators and reduces the likelihood that petition proponents will be able to place their petitions on the ballot." *Id.* The State countered that the Statute was justified as a means to combat irregularities and fraud in the election process. The district court dismissed much of the State's evidence, however, as inconclusive or irrelevant. It concluded, "[W]hile the State of Ohio's evidence might show that fraud has occurred when the payment per-signature method is used, it has not isolated the form of payment as being the cause of or an incentive to wide spread petition signature fraud in Ohio." *Id.* at 838.

The State timely appealed the district court's denial of its motion for summary judgment.

## II

### A.     Fed. R. Civ. P. 56

The court reviews de novo the district court's grant of summary judgment. *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 619 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 2100 (2007). Summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To survive summary judgment, the non-movant must provide evidence beyond the pleadings "set[ting] out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e).

### B.     Balancing First Amendment Rights Against the Regulation of Elections

#### 1.     In General

The First Amendment to the U.S. Constitution reads in part, "Congress shall make no law . . . abridging the freedom of speech, . . . or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." The Fourteenth Amendment extends these prohibitions against the States. *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940). One of the main interests embodied in the First Amendment is that of a free, sovereign people using the power of persuasion, rather than force, to govern itself. Accordingly, the Supreme Court has held that the First Amendment places a high value on the right to engage freely "in discussions concerning the need for [political] change," including change accomplished through petitions and elections. *Meyer v. Grant*, 486 U.S. 414, 421 (1988).

First Amendment rights to free speech, to assemble, and to petition the government are not, of course, without boundary. With respect to elections, Article I, Section 4 of the Constitution grants to States the authority to determine "The Times, Places and Manner of holding Elections." As the Supreme Court explained in *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997), "[I]t is . . . clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder," *id.* at 358 (citing *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) ("[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." (internal quotation marks omitted))). "States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally." *Buckley v. Am. Constitutional L. Found.*, 525 U.S. 182, 191 (1999) (citations omitted). When the boundaries of First Amendment rights push up against a State's authority to regulate elections, cases like the present one arise.

CTR asserts that Ohio's requirement that circulators be paid only on the basis of their time worked (the "per-time-only" requirement) places a severe burden on its First Amendment rights. The State counters that the burden is not severe and, even if it is, the burden is justified by the need

to counter election fraud.  In *Timmons*, the Supreme Court set forth the following framework for resolving these types of competing interests:

> When deciding whether a state election law violates First and Fourteenth Amendment associational rights, we weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary.  Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest.  Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions. No bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms.

520 U.S. at 358-59 (internal quotation marks and citations omitted); *see also Buckley*, 525 U.S. at 192 ("We have several times said no litmus-paper test will separate valid ballot-access provisions from invalid interactive speech restrictions; we have come upon no substitute for the hard judgments that must be made." (internal quotation marks omitted)).

### 2. Character and Magnitude of the Burden

#### a. Prior Decisions

The State of Ohio argues that its per-time-only requirement imposes, at most, only a moderate burden on CTR's rights.  It faults CTR for failing to show, in the State's words, that the ban would cause "a significant, quantitative decrease in the number of circulators available" or that it "would decrease the number of issues successfully placed on the ballot." Appellant's Br. at 18. It asserts that we should apply a "less exacting review" and that, under this review, the requirement meets the standard for a "reasonable, nondiscriminatory restriction[]." *Timmons*, 520 U.S. at 358. CTR argues, on the other hand, that the cumulative effect of the Statute on the petition process severely burdens CTR's core political speech rights.

The Supreme Court first addressed the issue of payment to petition circulators in *Meyer v. Grant*.  The State of Colorado had banned proponents of petitions from paying circulators, among other restrictions.  The Court subjected Colorado's payment ban to "exacting scrutiny." *Meyer*, 486 U.S. at 420 (citations omitted).  The Court determined that the ban restricted political expression in two fundamental ways: (1) it "limit[ed] the number of voices who will convey [the petitioner's] message and the hours they can speak and, therefore, limits the size of the audience they can reach"; and (2) "it makes it less likely that [the petitioner] will garner the number of signatures necessary to place the matter on the ballot, thus limiting [the petitioner's] ability to make the matter the focus of the statewide discussion." *Id.* at 422-23.

The State of Colorado defended the measure in part by pointing out all of the other avenues of expression left open to petitioners.  The Court rejected the argument, explaining that simply because more-burdensome avenues of speech existed did not mean that Colorado could simply shut down a less-burdensome one: "Colorado's prohibition of paid petition circulators restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication." *Id.* at 424. The Court concluded that the burden Colorado had to overcome to justify its ban was "well-nigh insurmountable." *Id.* at 425.

Several years later the State of Colorado was again before the Supreme Court to justify several new petition regulations.  In *Buckley v. American Constitutional Law Foundation*, the Court looked at three provisions: "(1) the requirement that initiative-petition circulators be registered voters"; "(2) the requirement that they wear an identification badge"; and "(3) the requirement that

proponents of an initiative report the names and addresses of all paid circulators and the amount paid to each circulator." 525 U.S. at 186. Using again the "exacting scrutiny" it applied in *Meyer*, *id.* at 204, the Court struck down all three as too heavy a burden in comparison to the State's purported justifications of deterring fraud and corruption, *id.* at 205.

Since the *Meyer* and *Buckley* decisions, three circuits have considered whether bans on per-signature payments meet constitutional muster. The Eighth Circuit was the first when it considered North Dakota's ban in *Initiative & Referendum Institute v. Jaeger*, 241 F.3d 614 (8th Cir. 2001) ("*IRI*"). The court found the ban constitutional. It based its holding on the respective strengths of the proofs submitted:

> Examining the record in this case, we conclude that the State has produced sufficient evidence that the regulation is necessary to insure the integrity of the initiative process. In 1987, the Legislature passed § 16.1-01-12(11) in response to problems that occurred with an initiative that had been placed on the ballot in November 1986. State Representative Linderman stated, in regard to a 1986 signature campaign, that "students were being paid 25¢/signature. There were reported irregularities-taking names out of the phone book, etc." The limited legislative history available shows that the legislators were aware of, and contemplated, the bill's effect on the circulation of petitions, but that they were more concerned with the testimony they had heard regarding signature fraud.

> Furthermore, as mentioned in the previous section on the residency requirement, in 1994 approximately 17,000 petition signatures were invalidated. A subsequent investigation revealed that payment per signature was an issue in the 1994 incident.

> The appellants have produced no evidence that payment by the hour, rather than on commission, would in any way burden their ability to collect signatures. The appellants have only offered bare assertions on this point. While it may be argued that such assertions may establish an unacceptable burden on signature-gathering where the state cannot offer any evidence demonstrating the need to prohibit commission payments, *Cf. Meyer*, 486 U.S. at 424, 426, 108 S.Ct. 1886, when the state introduces evidence justifying the ban on commission payments as a necessary means to prevent fraud and abuse (as the state has in this case), initiative sponsors may not rest on bare assertions alone.

*Id.* at 618.

The Ninth Circuit addressed a similar per-signature ban passed by Oregon voters in *Prete v. Bradbury*, 438 F.3d 949 (9th Cir. 2006). After an abbreviated bench trial, the district court held that Oregon's ban did not unconstitutionally burden petitioners' core political speech rights. *Id.* at 953. The Ninth Circuit affirmed. After reviewing the standard set forth by the Supreme Court in *Meyer* and *Buckley*, the court distinguished Oregon's per-signature ban from the total ban on payments in *Meyer*. *Id.* at 962. It described Oregon's ban as simply "prohibit[ing] one method of payment." *Id.* It also read *Buckley* as modifying *Meyer*:

> To the extent *Meyer* may be read to indicate that any resulting decrease in the pool of available circulators is sufficient to constitute a "severe burden" under the First Amendment, in *Buckley* the Court refined its analysis and made clear that the *degree* of the decrease resulting from the measure is properly considered in determining the severity of the burden.

*Id.* at 962-63 (citation omitted, emphasis in original). The court found that the district court did not clearly err in rejecting the petitioner's evidence of circulators leaving or refusing to work in Oregon as "unsupported speculation." *Id.* at 964. The two primary affiants, William Arno of Arno Political Consultants ("APC") and Tracy Taylor of Taylor Petition Management, LLC, had little experience in Oregon, and thus could not offer a reliable estimate of the ban's effect on the cost of signature gathering in the state. *Id.* at 965. Likewise, their assertions regarding the effect the ban had on the validity rate of signatures carried little weight with the court. *Id.* at 966.

The court recognized that "from an economic perspective, eliminating one method of payment (but not every method, a la *Meyer*) for petition circulators could result in some barriers to entry in the signature procurement market." *Id.* at 967. Paying circulators by the signature "can be more productive of signatures than paying an hourly wage." *Id.* The court noted, however, that whether the measure actually created any barriers to entry was "a question of historical fact," and it did not find clear error with the district court's determination that no such barriers existed. *Id.* Even had the petitioners made the requisite showing, the barriers would have established only a "lesser burden" under the First Amendment. *Id.* at 968. This is because Oregon's ban was "quite limited in its proscription, barring only payment of petition circulators on the basis of the number of signatures gathered. It does not prohibit adjusting salaries or paying bonuses according to validity rates or productivity . . . which could likely counter any barriers to entry." *Id.* Thus, concluding that the petitioners had established only a "lesser burden" on their rights, the court subjected the per-signature ban to a "less exacting review" and ultimately upheld the ban. *Id.*

Finally, the Second Circuit followed the Eighth and Ninth Circuits in rejecting a petitioner's claim that a per-signature ban violated the Constitution. In *Person v. New York State Board of Elections*, 467 F.3d 141 (2d Cir. 2006), the court joined its two sister circuits in "find[ing] the record presented to [it] provides insufficient support for a claim that the ban . . . is akin to the complete prohibition on paying petition circulators" as in *Meyer* "or that the alternative methods of payment it leaves available are insufficient," *id.* at 143 (citations omitted). The court concluded that the petitioner's argument that paying circulators on a per-signature basis was the best economic incentive was insufficient to show an unconstitutional burden "when balanced against the state's interest in preventing fraud in the gathering of signatures." *Id.*

Several guide posts can be gleaned from these Supreme Court and circuit court decisions regarding the character and magnitude of the burden created by Ohio's per-time-only requirement. First, the question is fact-intensive, given the "sliding scale" analysis outlined by the Supreme Court in *Meyer*, *Buckley* and other decisions. *Lee v. Keith*, 463 F.3d 763, 768 (7th Cir. 2006) (describing the Supreme Court's flexible approach in similar First Amendment cases as a "sliding scale"). Bans on paying circulators, whether outright or partial, can impact political expression in at least three related but distinct ways: (1) a ban can reduce the number and hours of voices which will convey the message; (2) it can limit the size of the audience of the petition; and (3) it can lower the likelihood that a measure will qualify for the statewide ballot. A circulator plays a crucial role in the petition process because the circulator both has to express the petitioner's desire for political change and has to discuss the merits of the proposed change. Finally, although the availability of other payment methods might reduce the burden, the extent to which the more effective means are foreclosed is an important consideration.

### b.          Character and Magnitude of Ohio's Per-Time-Only Requirement

A review of the record evidence shows that Ohio's per-time-only requirement would make proposing and qualifying initiatives more expensive, primarily because of the inefficiencies inherent in a per-time-only system. The evidence also shows that so-called professional circulators would likely not work under a per-time-only system (or at least would choose a per-signature system if given the option). The evidence is mixed on how validity rates are affected. Moreover, CTR has

not pointed to any evidence showing that, outside a relatively small number of professional circulators, there exists a substantial number of people or a demonstrable percentage of Ohio's population who would participate under a per-signature system but not under a per-time-only system.

There is little dispute that operating under a per-time-only system will increase the costs of both proposing an initiative and qualifying it for the ballot. First, the ban eliminates the opportunity for a petitioner to enter into a fixed-price contract with a political consulting firm, signature coordinator, or circulator. Under a per-signature payment scheme, CTR can contract, for example, for 500,000 signatures at a fixed price of $1.50 per signature. The petitioner knows how much money it will need to raise at the outset to qualify its initiative. Under Ohio's per-time-only provision, however, the petitioner cannot enter into a fixed price contract to pay circulators per signature. O.R.C. § 3599.111. Moreover, § 3599.111 does not define the term "person." Section 1.59(C) of the Ohio criminal code states: "As used in any statute, . . . 'Person' includes an individual, corporation, business trust, estate, trust, partnership, and association." Thus, a petitioner is prohibited from paying a political consulting firm, signature coordinating firm, or any other business entity to gather a specific number of signatures for a fixed price. In other words, the ban works up and down the chain from petitioner to consulting firm to signature coordinating firm to circulator. Thus, the per-time-only provision adds an element of risk to the petition process which would otherwise be absent.

In addition to the increased risk, petitioners get fewer signatures for their money, according to CTR. Per-hour circulators are less efficient at gathering signatures than are per-signature circulators. The cause for this drop in efficiency is hardly novel: basic economic theory instructs that a producer will seek to maximize the output for which she gets paid until the cost to her of producing another marginal unit equals the payment she receives for it. Under the per-time-only provision, the output for which the circulator is to get paid would not be signatures, but rather time worked. Thus, the circulator would have an incentive to work as many hours as possible up to the point the wage earned for the marginal unit of time equaled the marginal cost to her of working that unit of time. The circulator's primary focus would be on the amount of time worked, not the quality of work product produced.

CTR further asserts that the best, most professional coordinators and circulators are not interested in working under a per-time-only system. They purportedly can earn more money working on a per-signature basis than they can under any other system. Tracy Taylor testified that his top coordinators that qualified his last two Ohio issues refuse to go to Ohio on an hourly basis. This reluctance on the part of some professional coordinators and circulators also makes economic sense. If, for example, the professional circulators are more efficient than the average circulator in the sense that they can gather more valid signatures within a given unit of time, they will be financially better off working under a system that rewards them based on their efficiency, rather than a system which pays them based on something for which they do not have a comparative advantage, quantity of time worked.

According to CTR, the cumulative effect of the inefficiencies caused by a per-time-only system increases the amount of time it takes to collect signatures, further exacerbating the risk of unforeseen costs. As a result, CTR contends that it and other firms are not only less likely to qualify their proposed initiatives for the ballot, but are less likely even to try. The State counters by pointing to the relatively stable numbers of qualifying petitions in Oregon before and after it enacted its per-signature ban in 2002. The Oregon numbers suffer, however, from a similar defect in Colorado's experience that the Supreme Court pointed out in *Meyer*: the statistic "does not reject the possibility that even more petitions would have been successful if paid circulators had been available, or, more narrowly, that [petitioners] would have had greater success if they had been able to hire extra help." 486 U.S. at 418 n.3.

CTR has also presented evidence that circulators paid by the time worked yield lower validity rates than circulators paid by the signature. The evidence is limited, however, and inconclusive. For example, Michael Arno stated in a declaration that his company's validity rates dropped in all three of its petition drives it handled in Oregon after the per-signature ban went into effect in that state. Lee Albright, the owner of a petition management company, testified that his firm collected signatures for an initiative in Oregon after the ban. His firm ended up collecting twice the number of signatures needed to get the initiative on the ballot because he was afraid that the amateur petition circulators would collect too many invalid signatures. However, Ohio has submitted evidence from Oregon's Secretary of State that the average validity rate on petitions actually increased from 69.63% in 2002 to 72.35% in 2004. At best, CTR has raised a question of fact whether validity rates are lower under a per-time-only scheme.

Finally, there is little in the record to suggest that a substantial number of people in Ohio would be dissuaded from participating in the petition process because of a ban on all payment not based on time worked. This is not a case like in *Buckley* where approximately 35% of the state's population was categorically prohibited from participating. 525 U.S. at 193-94 & n.15. Nor has CTR proffered, for example, a broad-based survey to show a demonstrable decrease in the pool of potential circulators.

Accordingly, a review of the record confirms that there is no genuine issue of material fact (1) that Ohio's per-time-only requirement would make proposing and qualifying initiatives more expensive; and (2) that professional coordinators and circulators would likely not work under a per-time-only system. As to the validity rates and the available statewide pool of circulators, however, the matters are at best issues of fact.

### c.          Where Does § 3599.111 Fit Along the Sliding Scale?

If the Supreme Court's decision in *Meyer* lies at one end of the spectrum and the *IRI*, *Prete* and *Person* decisions lie at the other, then this case falls somewhere in between. Ohio's partial ban on payment is not as draconian as the complete ban in *Meyer*. However, it has a couple of features that distinguish it from those considered in the other circuit court decisions.

One difference between the present case and *IRI*, *Prete* and *Person* is that Ohio's ban is more restrictive. North Dakota, Oregon and New York all banned payments made on a per-signature basis; Ohio, on the other hand, has banned all remuneration to circulators except on a per-time basis. The difference is not academic. As the Ninth Circuit recognized in *Prete*, Oregon's ban on per-signature payments left open various other means of payment besides one based solely on the time worked:

> Allowable practices include: paying an hourly wage or salary, establishing either express or implied minimum signature requirements for circulators, terminating circulators who do not meet the productivity requirements, adjusting salaries prospectively relative to a circulator's productivity, and paying discretionary bonuses based on reliability, longevity and productivity, provided no payments are made on a per signature basis.

*Prete*, 438 F.3d at 952 n.1 (quoting Or. Admin. R. 165-014-0260); *see also Person*, 467 F.3d at 143 (noting that New York's statute "specifically prohibits only the per-signature payment to election workers"); *IRI*, 241 F.3d at 616 (reviewing North Dakota's provision which prohibits payment "on a basis related to the number of signatures obtained").

This is a significant distinction. Under a plain reading of § 3599.111, CTR (or its subcontractors) could not give a bonus to a circulator based on productivity or longevity. CTR could not set a minimum signature requirement because, in order to earn a day's wages, for example,

a circulator would both have to work a certain number of hours and have to collect a certain number of signatures, thereby partially tying earnings to the number of signatures. Arguably, CTR could not terminate a circulator who consistently did not collect enough signatures because, again, to earn a wage (and keep the job) the circulator would, among other things, have to collect a minimum number of signatures. Furthermore, CTR could not base a circulator's earnings on the geographic area covered (pay per city block, for example). It is even unclear whether CTR could pay a salary to a circulator unless it strictly limited the hours worked. If, instead, a salaried circulator were responsible for completing a number of duties each day or week regardless of the number of hours worked (i.e., the typical plight of the salaried worker), then in a sense the circulator would be compensated on a basis other than strictly time worked. This added difficulty with motivating a workforce reinforces CTR's argument that proposing and qualifying initiatives would be significantly more expensive under § 3599.111.

Another difference between § 3599.111 and the other state provisions is the penalty for a violation. The New York provision makes a violation a misdemeanor punishable by up to one year of imprisonment, a fine of $100 to $500, or both. *Person*, 467 F.3d at 143 (citing N.Y. Elec. L. § 17-122(1), violation of which is a misdemeanor); N.Y. Elec. L. § 17-166 (stating that penalty for any such misdemeanor violation). Similarly, the North Dakota provision makes a violation a misdemeanor punishable by up to one year of imprisonment, a fine up to $2,000, or both. *IRI*, 241 F.3d at 616 (citing N.D. Cent. Code § 16.1-01-12(11), violation of which is a class A misdemeanor); N.D. Cent. Code § 12.1-32-01(5) (describing the penalty for a class A misdemeanor). Violation of the Oregon provision is punishable by a minimum of a $100 civil fine. *Prete*, 438 F.3d at 952 n.1. In contrast, anyone who was to violate § 3599.111 would be guilty of a felony punishable by imprisonment between six and twelve months, a fine up to $2,500, or both. O.R.C. § 3599.111(E) (stating that violation of the Ohio provision constitutes a felony of the fifth degree); O.R.C. § 2929.14(A)(5) (describing the penalty for a felony of the fifth degree).

With the broader ban on the types of payment and harsher criminal sanctions for violations, Ohio's provision lies closer to the complete ban in *Meyer* than the partial bans in the other circuit court cases.[3] As the Supreme Court explained in *Meyer*, "The First Amendment protects [petitioners'] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." 486 U.S. at 424. While petitioners are not constitutionally guaranteed an endless variety of means, when their means are limited to volunteers and to paid hourly workers who cannot be rewarded for being productive and arguably cannot be punished for being unproductive, they carry a significant burden in exercising their right to core political speech.

### 3. The State's Interest in Eliminating Fraud

When a State places a severe or significant burden on a core political right, like here, it faces a "well-nigh insurmountable" obstacle to justify it. *Meyer*, 486 U.S. at 425; *cf. Buckley*, 525 U.S. at 192 n.12. The provision must be narrowly tailored and advance a compelling state interest. *Timmons*, 520 U.S. at 358; *Meyer*, 486 U.S. at 423-24. Although a State need not present "elaborate, empirical verification" of the weight of its purported justification when the burden is moderate, *see Timmons*, 520 U.S. at 364, it must come forward with compelling evidence when the burden is higher, *see Buckley*, 525 U.S. at 203-04; *Meyer*, 486 U.S. at 425-28.

---

[3]We take no position on the hypothetical question of whether, if Ohio were to enact a partial ban similar to Oregon's, North Dakota's or New York's, that partial ban would be subject to the less exacting review of *Timmons*. The constitutional analysis is, as we have noted, fact- and context-intensive. There may be significant differences between how Ohio and those other States govern and operate their respective petition drives and elections which would make even a lesser ban in Ohio subject to the more exacting scrutiny of *Meyer*. But, again, as the question is not before us, we will address the matter no further.

While eliminating election fraud is certainly a compelling state interest, § 3599.111 is not narrowly drawn. First, there is no evidence in the record that most, many, or even more than a de minimis number of circulators who were paid by signature engaged in fraud in the past. The State points primarily to the 2004 presidential election, when circulators trying to get Ralph Nader on the ballot engaged in fraud. The circulators were paid on a per-signature basis. *CTR*, 462 F. Supp. 2d at 834. While this is evidence that circulators who were paid per-signature engaged in fraud, it does not prove that the per-signature feature actually caused or significantly contributed to the circulators' fraudulent acts. At most, the evidence of fraud associated with the Nader election effort and other elections is evidence of correlation, not causation.

Of course, just as CTR argues that per-signature payment creates a better incentive for hard, efficient work and valid signatures, it cannot escape the flip-side of the argument: the payment also creates an economic incentive to engage in fraud by padding signatures (whether by forgery, false certification or false pretense). Just as the Supreme Court took judicial notice in *Meyer* that "it is often more difficult to get people to work without compensation than it is to get them to work for pay," 486 U.S. at 423, we can take judicial notice that there is an incentive to inflate the measure of output when payment is directly tied to that output. If a person gets paid by the hour, there is an incentive to pad hours; if a person gets paid by the signature, there is an incentive to pad signatures.

That is not to say, of course, that someone faced with the incentive to pad signatures will actually act upon it. That is an empirical question, one for which there is little in the record to answer. The State has not, for example, pointed to evidence from Oregon suggesting a marked decrease in the level of election fraud since its per-signature ban was enacted. While there is some evidence that validity rates have increased, *see supra*, there are many non-fraudulent reasons why signatures are rejected (e.g., insufficient information about the signer, illegible handwriting). The State's correlation evidence is relevant, if only circumstantial, evidence, but it is a far cry from showing that the provision is narrowly tailored (or even reasonably tailored) to the State's legitimate interest in reducing election fraud. As explained in *Meyer*, courts should not be "prepared to assume that a professional circulator—whose qualifications for similar future assignments may well depend on a reputation for competence and integrity—is any more likely to accept false signatures than a volunteer who is motivated entirely by an interest in having the proposition placed on the ballot." 486 U.S. at 426.

Moreover, Ohio already has criminalized election fraud, specifically with regard to false signatures. *See* O.R.C. § 3599.28 (making false signatures on election-related documents a felony of the fifth degree). This and other criminal provisions of Ohio election law are the types of protections that the Supreme Court has found "adequate" to deter improper conduct with regard to petition circulation, "especially since the risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting." *Meyer*, 486 U.S. at 427 (citations omitted).

Accordingly, under the exacting scrutiny of *Meyer* and *Buckley*, Ohio's per-time-only requirement is not sufficiently tied to its otherwise legitimate interest.

### III

The State of Ohio argues in large measure that CTR's evidence of increased costs establishes not a free-speech problem, but a business problem. Yet, the State largely misses the point that free speech can be costly. By making speech more costly, the State is virtually guaranteeing that there will be less of it. Because its ban on all forms of payment to circulators except based on the amount of time worked would create a significant burden on CTR's and other petitioners' core political speech rights, the State must justify it with a compelling interest and narrowly tailored means. It

fails to raise a genuine issue of material fact that § 3599.111 is narrowly tailored.  Therefore, we **AFFIRM** summary judgment in favor of CTR.