W. EUGENE DAVIS, Circuit Judge,
dissenting.
I respectfully dissent from the majority’s decision reversing the preliminary injunction entered by the district court barring the Texas Secretary of State from enforcing five provisions of the Texas Election Code. The enjoined provisions are described as follows:
*401 (1) Texas Election Code § 13.031(d)(3) to the extent it forbids non-Texas residents from serving as volunteer deputy registrars (“VDRs”) (the “Non-Resident Provision”);
(2) Texas Election Code § 13.038 to the extent it prohibits VDRs appointed in one county from serving in another county (the “County Provision”);
(3) Texas Election Code § 13.008(a)(2) & (3) (the “Compensation Provision”);
(4) Texas Election Code § 13.038 to the extent it prohibits VDRs from photocopying or scanning voter registration applications submitted to the VDR but not yet delivered to the county registrar (so long as no information deemed confidential under § 13.004 is included) (the “Photocopying Provision”); and
(5) Texas Election Code § 13.042 to the extent it prohibits VDRs from sending completed voter registration applications via United States mail (the “Personal Delivery Provision”).
The district court, following a lengthy evidentiary hearing and extensive briefing, held that the Non-Resident Provision, the County Provision, and the Compensation Provision unconstitutionally interfere with the plaintiffs’ rights under the First Amendment and the Photocopying Provision and the Personal Delivery Provision are preempted by the National Voter Registration Act (“NVRA”), 42 U.S.C. §§ 1973gg et seq.
In its opinion, the majority concludes that the plaintiffs’ activities affected by the Non-Resident Provision and the County Provision are not protected speech and, after accepting an interpretation of the Compensation Provision that is textually unsupportable, finds that the provision does not interfere with the plaintiffs’ First Amendment rights. The majority also disagrees with the district court’s conclusion that the Photocopying Provision and the Personal Delivery Provision are preempted by the NVRA.
My difference with the majority, in general, is two twofold: first, in my view the majority takes an unsupportably restrictive view of the scope of plaintiffs’ activity to register voters that is protected by the First Amendment. The majority also ignores clear conflicts between two provisions of the Texas Election Code and the NVRA. In short, I would affirm the district court’s thorough, well-reasoned opinion.
I.
First Amendment
My disagreement with my colleagues’ treatment of this case rests in large part on how the majority slices and dices the activities involved in the plaintiffs’ voter registration drives instead of considering those activities in the aggregate. Ordinarily, when Project Vote and Voting for America set up a voter registration drive, they cooperate with local organizations in the targeted area, while maintaining control of the process. They hire canvassers from the local community, but also rely on experienced canvassers and organizers from out of state to manage the drive, train employees, and demonstrate proper techniques for voter registration. Once trained, the canvassers are deployed throughout the targeted community to attempt to persuade eligible voters to register to vote. Canvassers raise issues of local importance and stress that voting is a forum for voters to voice their views. If the canvasser is successful, he provides a blank application to the applicant and assists in completing the form. The canvasser then collects the completed form and returns it to the organization, where it is reviewed for completeness and signs of fraud. The non-confidential portions of the application are then scanned or photocopied for tracking purposes and then de *402 livered to the appropriate registrar. The plaintiffs use the photocopy to follow up with the registrar to verify that the registration application has been processed and the applicant added to the voting rolls. If not, the plaintiffs follow up as needed to correct the situation. At election time, the plaintiffs urge the newly registered voters to actually vote and may provide transportation assistance to the voting area.
The Secretary and the majority concede that “some voter registration activities involve speech — ‘urging’ citizens to register; ‘distributing’ voter registration forms; ‘helping’ voters fill out their forms; and ‘asking’ for information to verify that registrations were processed successfully.” However, the majority draws a line between these portions of the voter registration drive they must concede are protected and all the other activity which they dismiss as outside the protection of the First Amendment and simply the administrative process of collecting and handling voter registration forms. In the words of the majority, “[o]ne does not ‘speak’ in this context by handling another person’s ‘speech,’ ” i.e., the voter registration application, which is the voter’s “speech.” In the majority’s view, all of the plaintiffs’ activities that occur after the voter completes the registration application are not speech. This would include processing the application and checking it for errors, submitting it to the appropriate registrar, following up to ensure that the application was processed and the applicant added to the voting rolls, and encouraging the voter to participate in subsequent elections.
Two Supreme Court cases applying First Amendment protections to laws regulating parties engaged in similar activities reject the majority’s line-drawing. In Buckley v. American Constitutional Law Foundation, Inc., 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999), the Court struck down Colorado’s requirements that those collecting signatures for a ballot initiative wear a badge and be registered Colorado voters. In Meyer v. Grant, 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988), the Court struck down Colorado’s ban on paying petition circulators. As the district court pointed out, it could have been said in Buckley and Meyer “that the invalidated regulations did not prevent anyone from actually speaking to another citizen in an attempt to persuade her to sign a petition; rather, the regulations just governed the act of collecting the signatures.” The Supreme Court rejected that distinction.
In Meyer, Colorado argued to the Supreme Court that the statute banning paid petition circulators (much as Texas does in this case) did not implicate speech. Colorado argued:
[T]he petition circulator [is] the person with the public duty to determine the validity of the signatures of the persons who sign the petitions.... The verification of signatures does not constitute speech, and the prohibition against payment of petition circulators constitutes nothing more than the prohibition against payment for the act of verifying signatures. The fact that a person voluntarily links his conduct with a speech component does not transform the conduct into speech.
Brief for Appellants, Meyer, 486 U.S. 414, 108 S.Ct. 1886 (No. 87-920), 1987 WL 880992, at *12. The Supreme Court rejected this argument and concluded that petition circulation involves “interactive communication concerning political change that is appropriately described as ‘core political speech.’ ” Meyer, 486 U.S. at 421-22, 108 S.Ct. 1886. Importantly, the Court did not isolate and limit the scope of its definition of core political speech to the verbal exchange between the petition circulator and the person whose signature was being solicited. Instead, it considered *403 the solicitation activity in the aggregate as core speech. Specifically, the court in Meyer concluded that Colorado’s ban on paid petition circulators impermissibly implicated the First Amendment by restricting political expression. The Meyer court explained that this ban restricted core speech because it limited the voices available to convey the message and therefore reduced the size of the audience that the canvassers could reach, making it less likely the campaign would be successful.
Similarly, in Buckley, the Supreme Court rejected Colorado’s argument that collection of signatures was a ministerial act performed on behalf of the state and therefore state regulations requiring canvassers to be Colorado registered voters and wear badges did not implicate the First Amendment. As Justice Thomas explained in his concurrence,
Even where a State’s law does not directly regulate core political speech, we have applied strict scrutiny ... because we have determined that initiative petition circulation of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change.
Buckley, 525 U.S. at 207, 119 S.Ct. 636 (Thomas, J., concurring). Thus, even though the Colorado regulation in Buckley did not directly regulate speech, the requirements that solicitors wear a badge and be Colorado registered voters were offensive in the same way the ban on paid circulators was in Meyer. Both regulations reduced the voices available to convey political messages. Id. at 210, 119 S.Ct. 636.
The Non-Resident Provision, the County Provision, and the Compensation Provision all limit who can participate in voter registration drives. As explained in more detail below, these provisions, like those in Buckley and Meyer, limit the number of voices available to convey the plaintiffs’ message. The majority proposes methods by which the plaintiffs could organize their voter registration drives to reduce the effect of these regulations. But judges are not experts in conducting voter registration drives and the Supreme Court made it clear in Meyer that “[t]he First Amendment protects appellees’ right not only to advocate their cause but also to select what they believe to be the most effective means for so doing.” 486 U.S. at 424, 108 S.Ct. 1886.
In Meyer and Buckley, as in this case, the plaintiffs were advocates seeking to collect signatures (and verify them) as part of core democratic activity. More particularly, the activity in Meyer and Buckley was to persuade as many voters as possible to approve a referendum initiative to be placed on the ballot. This required circulators to collect signatures on a petition, verify the signatures, and deliver the petition to the appropriate state official. In our case the activity is to persuade as many citizens as possible to participate in the democratic process. The first step is registering voters. This requires persuading and assisting a citizen to complete a voter application and ensure the delivery of the application to the appropriate registrar. Once the voter is registered, the plaintiffs urge registered voters to east their votes in scheduled elections. The speech rights of the plaintiffs in this case seeking to influence citizens to participate in the democratic process are as strong or stronger than the plaintiffs’ rights in Meyer and Buckley. The First Amendment rights of the canvassers in Meyer and Buckley and the canvassers in this case are indistinguishable: The right to conduct their campaign without unjustified burdens “limits the number of voices who will convey [plaintiffs’] message.” Meyer, 486 U.S. at 422, 108 S.Ct. 1886; see also Citizens United v. Fed. Election Comm’n, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (holding that federal election laws *404 prohibiting corporations and unions from using general treasury funds to make independent expenditures for speech defined as “electioneering communication” or for speech expressly advocating the election or defeat of a candidate is unconstitutional suppression of political speech).
The Supreme Court has a long line of cases holding that restrictions on expressive conduct, other than pure speech, may implicate the First Amendment. See, e.g., Texas v. Johnson, 491 U.S. 397, 404-06, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (flag burning); Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 505, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (arm bands to protest the Vietnam War); Brown v. Louisiana, 383 U.S. 131, 141-42, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (sit-ins to protest segregation). The plaintiffs’ conduct in this case is inherently expressive of their message of increasing citizen participation in the democratic process. Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 66, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006).
Also, the majority’s effort to slice the various portions of the registration effort into protected and unprotected activity ignores the fact that plaintiffs’ registration activity implicates not only their speech rights, it also implicates their freedom of association. Both are equally protected by the First Amendment. The plaintiffs’ activities do not cease when the voter registration application is complete. The plaintiffs receive and submit the application for processing and follow up with the registrar to ensure that the registration application resulted in a registered voter. They also follow up with voters to encourage them to vote. The freedom of the plaintiffs to associate with others for the advancement of common beliefs is protected by the First and Fourteenth Amendments. NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Kusper v. Pontikes, 414 U.S. 51, 56-57, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973).
As the Secretary concedes, nearly every federal court addressing this issue has found that the expressive conduct of actually registering voters, to the extent separable from the speech involved in persuading voters to register, is protected expressive conduct of those conducting the voter registration drive. See, e.g., Am. Ass’n of People with Disabilities v. Herrera, 690 F.Supp.2d 1183, 1200 (D.N.M.2010) (“In short, to participate in voter registration is to take a position and express a point of view in the ongoing debate whether to engage or to disengage from the political process. The Court concludes that the act of voter registration is expressive conduct worthy of First-Amendment protection.”); Project Vote v. Blackwell, 455 F.Supp.2d 694, 702 (N.D.Ohio 2006) (“[T]he Court is satisfied that participation in voter registration implicates a number of both expressive and associational rights which are protected by the First Amendment. These rights belong to — and may be invoked by — not just the voters seeking to register, but by third parties who encourage participation in the political process through increasing voter registration rolls.”).
If you start from what I believe is the correct baseline — that under the Supreme Court’s precedent, the plaintiffs’ entire voter registration activity is protected core political speech' — then “the question is not whether Plaintiffs’ conduct comes within the protections of the First Amendment, but whether Defendants have regulated such conduct in a permissible way.” League of Women Voters v. Cobb, 447 F.Supp.2d 1314, 1334 (S.D.Fla.2006). Assuming without deciding that the district court correctly applied the Anderson-Bur-dick balancing test to this question,[1] I am *405 satisfied that the district court correctly weighed the effect of each regulation on the plaintiffs’ First Amendment rights against the justifications raised by the state to conclude that the plaintiffs were entitled to a preliminary injunction barring enforcement of the above listed provisions. I consider briefly below the individual provisions of the Texas Election Code plaintiffs challenge in this case.
A. The Non-Resident Provision
The Non-Resident Provision, one of the provisions under review in the Texas Election Code, provides that only a Texas resident may be appointed as a VDR. See Tex. Elec.Code Ann. §§ 13.031(d)(3), 11.002(a)(5). Because only VDRs can handle or submit a registration application to the registrar, this regulation in effect makes it a crime for a non-resident to handle or submit a registration application. The district court accepted the plaintiffs’ testimony that this prevented the out-of-state campaign organizer from using its managers effectively in troubleshooting and identifying problems and generally organizing the campaign. Out-of-state managers cannot train, lead, demonstrate best practices, or perform quality control without ever touching an application — the registration drives’ central tool for engaging voters. The only state interest raised to justify the prohibition is the assertion that Texas residents will take better care of their fellow citizens’ registration forms than non-residents would. The Secretary provides no authority or analysis to support this bold assertion. I agree with the district court that any state interest identified is not strong and the regulation is not a narrowly tailored attempt to curtail any fraud that might be associated with out-of-state canvassers. This restrictions flies directly into the teeth of Buckley in which the Supreme Court struck down Colorado’s attempt to restrict petition circulators to registered voters of the state. The restriction in this case, as in Buckley, limits the number of voices available to convey plaintiffs’ message and, contrary to the conclusion of the majority, the plaintiffs have clearly demonstrated a likelihood of success on the merits of their challenge to this provision.
B. The County Provision
Texas Election Code § 13.038 provides that a VDR may distribute and accept applications for voter registration throughout the county in which he is qualified. As interpreted by the state of Texas, a VDR must be appointed in every county in which an applicant resides so that a VDR who is appointed in County A yet submits an application for a citizen who resides in County B is subject to criminal prosecution.[2] The district court found that the plaintiffs had demonstrated that the County Provision imposes heavy time and administrative burdens on their organizations. These rules force the organizations to have their canvassers and managerial staff appointed as VDRs in multiple counties. This is especially burdensome in the larger metropolitan areas where voters may reside in one of several area counties. As pointed out by the district court, a VDR active in the City of Dallas would need to be appointed in five different counties in order to accept applications in all parts of the city. Texas has 254 counties which magnifies the burden of this limitation. A VDR will not always know in which county a potential voter resides sim *406 ply by the fact that he is present at a registration drive rally. Thus, the VDR in this situation risks criminal sanctions for accepting a voter registration application from a resident of a county in which the VDR has not been appointed. It is obvious how this rule would chill the plaintiffs’ registration activities.
The Secretary provided little justification for this rule. State, not county, laws govern voter registration, so there are no county-specific issues relevant to VDR appointment. Although the Secretary argued that the County Provision helps prevent fraud by making local county registrars more aware of VDR activity in their counties, the registrars are made aware of the identity of the VDRs when they submit voter registration applications. See Tex. Elec.Code Ann. § 13.040 (VDRs must provide a receipt to the registrar with submitted voter registration applications that identifies the county of their appointment). The district court correctly found that this provision violated plaintiffs’ First Amendment rights.
C. The Compensation Provision
This provision subjects a campaign organizer, as employer, to criminal prosecution for compensating employees assisting in the campaign in a manner prohibited in this section. Tex. Elec.Code Ann. § 13.008. The Compensation Provision has three subparts: (1) a ban on “compensating] another person based on the number of voter registrations that the other person successfully facilitates,” Id. § 13.008(a)(1); (2) a ban on “presenting] another person with a quota of voter registrations to facilitate as a condition of payment or employment,” Id. § 13.008(a)(2); and (3) a ban on “engaging] in any other practice that causes another person’s compensation from or employment status with the person to be dependent on the number of voter registrations that the person facilitates.” Id. § 13.008(a)(3). The plaintiffs do not challenge subpart (1). They contend, however, that the remaining provisions severely burden their ability to conduct registration drives by preventing them from rewarding or sanctioning employees based on performance. They submit that the provisions expose them to criminal sanctions if they either: (1) terminate or discipline a canvasser who performs poorly; or (2) reward high performers by promoting them or increasing their pay.
The Secretary interprets the provisions as only imposing criminal sanctions on an employer who pays canvassers on a per-application basis or conditions payment or employment solely on a preset quota. However, I agree with the district court that this interpretation is inconsistent with the plain language of the statute.[3]
Subparts (2) and (3) prohibit an employer from conditioning employment on the number of applications collected or basing the employee’s compensation on applications collected. These restrictions effectively subject the plaintiffs to criminal sanctions for engaging in many common hiring and firing decisions. The Secretary argues that neither provision precludes general consideration of an employee’s productivity. However, when the employee’s job is to gather voter registration applications, the number of applications he obtains or facilitates is clearly an important measure of his productivity — a measure the Compensation Provision bars the *407 plaintiffs from using as a basis for employment and compensation decisions.
That these provisions hamper the voter registration activities of the plaintiffs is obvious. As the Sixth Circuit explained in striking down an Ohio compensation prohibition that banned “pay[ing] any other person for collecting signatures on election-related petitions or for registering voters except on the basis of time worked”:
[W]hen petitioner’s means are limited to volunteers and to paid hourly workers who cannot be rewarded for being productive and arguably cannot be punished for being unproductive, they carry a significant burden in exercising their right to core political speech.
Citizens for Tax Reform v. Deters, 518 F.3d 375, 385-87 (6th Cir.2008).
Again, the Secretary’s justification for this provision is the need to combat voter registration fraud. The ban on paying compensation directly for each application obtained serves this interest and the plaintiffs do not challenge that provision. However, the remaining provisions further the state interest minimally, if at all, and burden speech and association ■ by banning commonly accepted employment practices such as performance evaluations, performance-based pay, and the requirement of performance as a condition of employment. Violation of these provisions subject the employer to criminal prosecution and place an undue burden on the plaintiffs’ First Amendment rights. In my judgment, the district court correctly enjoined enforcement of subparts (2) and (3) of this provision.
II.
Preemption by the NVRA
The district court found that the remaining two provisions — the Photocopying Provision and the Personal Delivery Provision — -were preempted by the NVRA. The majority concedes that state election law may not “directly conflict” with federal election laws on the subject. Voting Integrity Project, Inc. v. Bomer, 199 F.3d 773, 775 (5th Cir.2000). The recent Supreme Court decision in Arizona v. Inter Tribal Council of Arizona, — U.S. —, 133 S.Ct. 2247, 186 L.Ed.2d 239 (2013), held that the state enjoys no presumption against preemption in election clause cases. Id. at 2256-57. Instead, we are instructed to interpret “Election Clause legislation ... to mean what it says.” Id.
A. The Photocopying Provision
With respect to the Photocopying Provision, plaintiffs challenge the Secretary’s interpretation of § 13.038. The Secretary argues that the Texas Election Code prohibits VDRs from photocopying registration applications because state law does not explicitly authorize this activity and because these documents are considered confidential under § 13.004. The plaintiffs contend that the NVRA’s public disclosure provision[4] preempts the prohibition on photocopying.
I agree with the district court that voter registration applications are “records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of offi *408 cial lists of eligible voters” under the relevant provision of the NVRA. 42 U.S.C. § 1973gg-6(i); Project Vote/Voting for Am., Inc. v. Long, 682 F.3d 331, 340 (4th Cir.2012). VDRs are deputized to act in the place of the county registrar when they distribute and receive voter registration applications. Tex. Elec.Code Ann. § 13.031. Section 1973gg-6(i) does not require that the records be in the hands of the state. It merely requires the state to maintain the records and make them available for public inspection. The myriad of regulations governing VDRs are based on the assumption that the state has the ability to protect that application by regulating how it is handled until it is in the hands of the local registrar. In doing so, the state (through the VDR) “maintains” the completed voter registration applications until they are submitted to the local registrar. Thus, a completed application in the hands of a VDR is a record that must be made available for photocopying under the NVRA. I agree with the district court that it would be an absurd result to forbid private parties from copying applications they are authorized to receive on behalf of the state before they are submitted to the state, when the NVRA requires the state to allow them to make a copy once the record has been submitted.
The privacy concerns raised by the Secretary are also answered by the NVRA. As stated in Long, “[i]t is not the province of this court ... to strike the proper balance between transparency and voter privacy.... Congress has already answered the question by enacting [section 1973gg-6(i) ], which plainly requires disclosure of complete voter registration applications.” 682 F.3d at 339. This conclusion is buttressed by the Supreme Court’s holding in Arizona that no presumption against preemption applies in these election clause cases.
B. The Personal Delivery Provision
The Texas Election Code states that “[a] volunteer deputy registrar shall deliver in person, or by personal delivery through another designated volunteer deputy, to the registrar each completed voter registration application submitted to the deputy.” Tex. Elec.Code Ann. § 13.042(a). This section of the election code prohibits VDRs from using U.S. mail to deliver the applications. Any VDR who violates this ban is subject to criminal prosecution. Id. § 13.043.
Several provisions of the NVRA require states to allow voter registration by mail. 42 U.S.C. § 1973gg-4(a)(l) (“Each State shall accept and use the mail voter registration application form prescribed ... pursuant to section 1973gg-7(a)(2).”); 42 U.S.C.1973gg-2(a)(2) (“[Notwithstanding any other Federal or state law, in addition to any other method of voter registration provided for under State law, each State shall establish procedures to register to vote in Elections for Federal office ... by mail application pursuant to section 1973gg-4....”).
I agree with the district court that the Texas Election Code provision presents a clear and direct conflict with the NVRA. The NVRA makes no distinction between applications submitted directly by a voter and those submitted by a third-party. The prospect of a criminal sanction effectively prevents the plaintiffs from using the mails to deliver applications to the registrar.
Because of the patent conflict, I would find that the plaintiffs have shown that they have a substantial likelihood of success on the merits on this issue and that the district court correctly enjoined its enforcement.
III.
For the above reasons and those stated by the district court in its careful opinion, *409 I am convinced that the plaintiffs have demonstrated a substantial likelihood of success on the merits of each provision of the Texas Election Code the district court enjoined the state from enforcing. No serious argument is advanced that plaintiffs failed to establish the remaining factors for issuance of the prehminary injunction — irreparable injury, balancing of harms, and the public interest. For reasons advanced by the district court, I conclude that plaintiffs clearly established these factors. I would AFFIRM the district court’s preliminary injunction and therefore DISSENT from the majority’s contrary conclusion.

. See Anderson v. Celebrezze, 460 U.S. 780, 780-90, 103 S.Ct. 1564, 75 L.Ed.2d 547 *405 (1983); Burdick v. Takushi, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992).

. Although plaintiffs initially understood the rules to require VDRs to also be trained in every county in which they sought appointment, the state has interpreted the statutes to require training in only one county.

. "[T]his Court may impose a limiting construction on a statute only if it is 'readily susceptible’ to such a construction.” United States v. Stevens, 559 U.S. 460, 130 S.Ct. 1577, 1591-1592, 176 L.Ed.2d 435 (2010) (quoting Reno v. ACLU, 521 U.S. 844, 884, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997)).

. The NVRA provision covering "Public disclosure of voter registration activities," states:
Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.
42 U.S.C. § 1973gg-6(i).