OPINION
 

 Per Curiam:
 

 These are consolidated appeals and cross-appeals concerning three initiative petitions.
 

 These appeals present a fundamental procedural question— whether the initiatives’ circulators’ failure to include statutorily mandated language in their affidavits verifying the signature-gathering process voids the signatures collected. Under this court’s precedent, the initiative circulators’ affidavits must substantially comply with certain statutory requirements. Here, the circulators’ affidavits completely failed to include two statements mandated by NRS 295.0575: first, they do not state the number of signatures on the document, and second, they do not state that each signer had
 
 *674
 
 an opportunity to read the full text of the initiative before signing. We conclude that the affidavits do not substantially comply with the statutory requirements. Moreover, the proponents’ efforts in the district court to cure the affidavits’ defects were insufficient because the proponents failed to make a valid offer of proof necessary to show whether the circulators nevertheless complied with the statute’s purposes.
 

 In addressing these issues, we reject the proponents’ First Amendment, challenge to enforcement of NRS 295.0575’s affidavit requirements, as the United States Supreme Court has implicitly approved of requirements similar to those at issue here. We also reject the proponents’ argument that enforcement of the statute is barred by substantive due process concerns or estoppel. We therefore affirm the district court’s judgment approving the decision of the Secretary of State to strike the signatures.
 

 FACTS
 

 The initiatives
 

 The Las Vegas Convention and Visitors Authority (LVCVA) is a statutorily created body that markets Las Vegas as a worldwide tourist and convention destination. It has described its mission as “attracting an ever-increasing number of visitors to Southern Nevada.” It also operates the Las Vegas Convention Center and the Cashman Center. It is defined in NRS 354.474 as a local government entity because it was created pursuant to NRS Chapter 244A, governing county park and recreation commissions.
 

 The LVCVA is funded primarily by room taxes imposed by the local governments in Clark County, including the County itself and its incorporated cities. Additional funding is obtained from gaming license fees imposed by most of these local governments.
 
 [2]
 
 Two of the initiatives, the Education Enhancement Act and the Funding Nevada’s Priorities Act, seek to divert a portion of the LVCVA’s funding to other purposes.
 
 [3]
 
 The Education Enhancement Act would devote the LVCVA’s room tax and gaming license revenue over its 2006-07 level (adjusted for inflation) to the State Distributive School Account, which funds K-12 education throughout the state. The Funding Nevada’s Priorities Act would divide this excess income into three equal parts, with one-third going to the State Dis
 
 *675
 
 tributive School Account; one-third to the State Highway Fund; and one-third to the Public Safety Fund, which is a fund created by the initiative to fund services such as police, fire, homeland security, and corrections.
 

 The Nevada Taxpayers Protection Act initiative petition seeks to amend the Nevada Constitution to require that at least two-thirds of the voters approve any ballot initiative proposing a statutory or constitutional law that would “create, generate, or increase” public revenue in any manner, before that initiative could become law. In addition, to correct a perceived loophole allowing the Legislature to enact revenue-generating initiative statutes by simple majority vote, even though it must normally enact revenue-generating statutes proposed in a bill or by joint resolution by a two-thirds vote,
 
 [4]
 
 the Taxpayers Protection initiative also states that any such initiative submitted to the Legislature would be subject to the constitutional provision requiring approval by two-thirds of the Legislature. The initiative’s opponents dispute that any such loophole exists, arguing that any revenue-generating law enacted by the Legislature in whatever form, is subject to the preexisting two-thirds vote requirement.
 

 Procedural history of the initiatives ’ challenges
 

 The LVCVA filed in the district court a declaratory relief action challenging the Education Enhancement Act and the Funding Nevada’s Priorities Act. Clark County and the cities of Las Vegas, North Las Vegas, Mesquite, Henderson, and Boulder City (“the local governments”) filed a separate declaratory relief action challenging the two initiatives. The two actions were consolidated. Following briefing and oral argument, the district court ruled in favor of the proponents, refusing to invalidate the initiatives. The district court also concluded that, while the local governments could not campaign for or against the initiatives, they could maintain the declaratory relief actions.
 

 The LVCVA appealed, and its appeal was docketed as No. 51509. The local governments also appealed; their appeal was docketed as No. 51564. The proponents cross-appealed in both cases, challenging the portion of the district court’s ruling that permitted the local governments to maintain the actions.
 

 Similarly, opponents of the Nevada Taxpayers Protection Act, the nonprofit organizations Nevadans for Nevada and Nevada State Education Association, challenged that initiative’s description of effect in the district court. The district court declared that the initiative petition’s description of effect was valid and denied the initiative’s opponents relief. The initiative’s opponents then appealed; their appeal was docketed as No. 51639.
 

 
 *676
 
 While the appeals were in briefing, the Secretary of State determined that the circulators’ affidavits for all three initiatives were defective. In particular, none of the affidavits set forth the number of signatures on the document or a statement that each signer had an opportunity to read the full text of the initiative before signing, as required under NRS 295.0575. The Secretary of State found that the affidavits were defective and that no signatures collected by circulators with defective affidavits could be counted. Since all of the affidavits shared the same defects, the county clerks all returned verification results showing that no valid signatures for any of the initiatives had been collected. The proponents “appealed” the county clerks’ results, essentially seeking reconsideration of the Secretary of State’s decision to instruct the clerks not to count signatures with defective affidavits. The appeal was denied, and the proponents then filed a petition seeking various forms of relief in the district court.
 

 The proponents asserted that, in preparing the affidavits, they relied on a publication prepared by the Secretary of State entitled, “The 2008 Initiative and Referendum Guide” (the “Initiative Guide”), which contained an affidavit form identical to that set forth in NAC 293.182 in its appendix. The version of the Initiative Guide relied upon by the proponents indicates that it was last revised on August 28, 2007. Notably, the Initiative Guide’s preface and the introductory page for its appendix both warned that the material in the Initiative Guide might not contain the most recent updates and that the statutes and other governing law should be checked. The preface stated, in pertinent part with the emphasis in the original,
 

 The purpose of this booklet is to provide an understanding of the guidelines and requirements necessary for preparing and qualifying initiatives and referenda for the ballot.
 
 It is important to note that this guide is for general information only and does not have the force and effect of Nevada law, regulation or rule.
 
 Interested citizens should obtain the most recent version of the Nevada Revised Statutes, as Nevada’s Election Laws are amended each legislative session.
 

 The introductory page for the Initiative Guide’s appendix, containing forms and copies of election statutes and regulations, stated, “The enclosed sections of the NRS do not reflect revisions made by the Nevada Legislature at its 2007 session as those revisions were not codified at the time this guide was published. Please check with the Legislative Counsel Bureau for the most recent version of the NRS.”
 

 Despite these warnings, the proponents did not review the pertinent statutes in NRS Chapter 295, particularly NRS 295.0575, and did not review the affidavit form set forth in NAC 295.020,
 
 *677
 
 which applies specifically to petitions for initiatives or referenda. The proponents stated that their circulators had copies of the initiatives as part of their documentation, but they did not indicate that the circulators were made aware that they should offer the opportunity to review the text to those signing the petitions. They were also apparently not informed that they should count the number of signatures that they obtained.
 

 After a hearing, the district court issued its ruling upholding the Secretary of State’s decision. The district court agreed with the proponents that the circulators’ affidavit statute requires only substantial, not strict, compliance, but it held that the affidavits failed to meet even the more lenient standard. The district court further found that the affidavits could not be corrected, since the circulators could not swear that they had provided an opportunity to signers to review a measure’s text when they had not been made aware of the requirement that they do so. The district court also rejected the proponents’ constitutional arguments, holding that the restriction implicit in the statute was permissible under United States Supreme Court precedent, that the statute took precedence over any regulation, and that the inaccuracies in the Initiative Guide prepared by the Secretary of State did not render the statute unenforceable. The proponents’ appeal in Docket No. 52045 followed. It was consolidated with the other pending appeals and cross-appeals involving the three initiatives, and the matters were expedited.
 

 DISCUSSION
 

 As a threshold matter, we determine that the LVCVA’s participation in the underlying court actions and in these appeals was permissible because, as we have previously held, the statute barring the use of public funds to “support or oppose” a ballot question does not prohibit government entities from challenging an initiative before it is placed on the ballot. As the LVCVA is addressing the propriety of placing initiatives on the ballot, it may participate in these cases.
 

 We then confront the issues of whether the circulators’ affidavits satisfied statutory requirements and whether the governing statute is constitutional and enforceable in this case. Because we will not decide constitutional questions unless necessary,
 
 [5]
 
 we first consider whether the statutory requirements were satisfied. We hold that the proponents failed to substantially comply with statutory requirements, and we further determine that the proponents’ attempt to cure the affidavits’ defects was insufficient and that striking the signatures was therefore the proper remedy. Turning to the propo
 
 *678
 
 nents’ constitutional challenges, we hold that the statute does not violate the First Amendment or substantive due process. Also, its enforcement is not barred by estoppel. Accordingly, the district court properly upheld the Secretary of State’s determination to strike the signatures in this case. Our disposition of these issues renders the remaining issues in these consolidated appeals moot.
 

 The LVCVA may participate in a court challenge to an initiative
 

 The proponents’ cross-appeal in Docket Nos. 51509 and 51564 raises the issue of whether the LVCVA
 
 [6]
 
 was barred from participating in court actions challenging the initiatives by NRS 281A.520, which prohibits a public officer or employee from causing a government entity “to incur an expense or make an expenditure to support or oppose ... a ballot question.” Based on this statute, the proponents argue, the LVCVA cannot incur any expense or make any expenditure to support or oppose the initiatives, and thus, its extensive participation in the underlying district court actions and these appeals was improper. The proponents maintain that this court’s 2002 holding in
 
 Glover v. Concerned Citizens for Fuji Park,
 

 [7]
 

 permitting a local government to bring a court action challenging an initiative’s placement on the ballot, was superseded by the Legislature’s 2003 amendments to the governing statute. The LVCVA disputes the 2003 amendments’ import and maintains that
 
 Glover
 
 controls the disposition in this case.
 

 Glover
 
 interpreted the predecessor of the current statute, former NRS 293.725, which provided
 

 The government of this state or a political subdivision of this state or an agency thereof shall not incur an expense or make an expenditure to support or oppose:
 

 1. A ballot question.
 

 2. A candidate.
 

 In
 
 Glover,
 
 we considered a district court order directing the Carson City Clerk to place an initiative on the ballot.
 
 [8]
 
 In resolving that matter, we necessarily addressed the initiative’s proponents’ argument that Carson City was barred by NRS 293.725 from challenging the initiative because it was spending money to “oppose”
 
 *679
 
 the initiative.
 
 [9]
 
 Carson City maintained that it was not opposing the ballot measure, but rather it was simply raising issues concerning the measure’s constitutionality.
 
 [10]
 

 This court concluded that the statute was ambiguous and that the legislative history suggested that it should be interpreted narrowly to preclude only campaigning for or against a measure that had already been placed on the ballot.
 
 [11]
 
 Moreover, this court determined that nothing in the legislative history indicated that it should be applied to bar a government entity from challenging an initiative in court before it was placed on the ballot and that such an interpretation would lead to absurd results.
 
 [12]
 
 Accordingly, this court permitted Carson City to challenge the initiative.
 

 The following year, during the 2003 legislative session, a bill was introduced to amend NRS 293.725 to clarify that a certain type of pamphlet, brochure, or advertisement, featuring an incumbent candidate and touting the benefits of his or her agency or department, that was distributed within a certain time period before that incumbent’s reelection date, was prohibited.
 
 [13]
 
 The language interpreted by this court in
 
 Glover
 
 was not modified. After some further amendments not pertinent to this case, NRS 293.725 was repealed, and its language was recodified in NRS Chapter 281 without any modification of the language construed by this court in Glover.
 
 [14]
 

 It is well settled that when the Legislature amends a statute without disturbing language previously interpreted by this court, it is presumed that the Legislature approved the interpretation.
 
 [15]
 
 Thus, here, the Legislature implicitly approved this court’s holding in
 
 Glover
 
 and did not intend to prohibit a local government from challenging in court an initiative’s placement on the ballot. Accordingly, the LVCVA was permitted to participate in the underlying district court actions and these appeals.
 
 [16]
 

 
 *680
 

 The district court properly upheld the Secretary of State’s decision not to count the signatures because of defects in the circulators ’ affidavits
 

 NRS Chapter 295 sets forth the requirements for ballot initiatives and referenda, specifying the signature requirements for statewide initiatives.
 
 [17]
 
 To place an initiative seeking to amend the Nevada Constitution on the ballot, the proponents must gather a sufficient number of signatures according to a statutory formula.
 
 [18]
 
 In so doing, the proponents must comply with certain circulation and verification procedures contained in the general elections chapter, NRS Chapter 293.
 
 [19]
 
 Each circulator must file the signatures with the various county clerks (in some counties, the registrar of voters) for verification.
 
 [20]
 
 The circulator’s submission must be accompanied by the affidavit required by NRS 295.0575.
 
 [21]
 
 The county clerk has four business days to transmit the total number of signatures on the documents to the Secretary of State.
 
 [22]
 
 If the total number of signatures is less than required, then the Secretary of State shall notify the proponents and “no further action” shall be taken on the petition.
 
 [23]
 
 If at least the required number of signatures is present, then the Secretary of State so notifies the county clerks, who have nine business days to verify the signatures.
 
 [24]
 
 Depending on the number of signatures, verification of all signatures may proceed, or the clerk may verify a random sample of at least 500 or 5 percent of the signatures, whichever is greater.
 
 [25]
 
 The county clerk
 
 *681
 
 transmits the verification results to the Secretary of State,
 
 [26]
 
 who qualifies or disqualifies the measure based on the results.
 
 [27]
 
 A proponent may appeal the county cleric’s verification results to the Secretary of State, whose decision is final for purposes of judicial review.
 
 [28]
 

 NRS 295.0575, setting forth the requirements for a circulator’s affidavit, was adopted by the Legislature in 2007. Specifically, the statute requires each circulator to complete an affidavit swearing to the following:
 

 1. That [the affiant] personally circulated the document;
 

 2. The number of signatures thereon;
 

 3. That all the signatures were affixed in his presence;
 

 4. That each signer had an opportunity before signing to read the full text of the act or resolution on which the initiative or referendum is demanded.
 

 Here, it is undisputed that all affidavits for all three initiatives lack the items listed in subsections (2) and (4) of the statute: the number of signatures and a statement that each signer had an opportunity to read the measure’s full text before signing it. Instead, the affidavits followed a form contained in the Secretary of State’s Initiative Guide, which was prepared before the 2007 legislative amendments to NRS Chapter 295 were codified or incorporated into amendments to the governing regulations. The form in the Initiative Guide was apparently based on NAC 293.182, which applies generally to all petitions requiring validation of signatures, and an older version of NAC 295.020, which had not yet been amended to reflect the 2007 legislative changes. (NAC 295.020 was amended in December 2007.) Despite the Initiative Guide’s warnings to consult the current election statutes, the proponents did not review the 2007 statutory changes before proceeding with the initiatives.
 

 The proponents argue that only substantial compliance with the statute is required and that the affidavits substantially complied because the reasonable purposes of the statute were met. They also assert that NRS 295.0575 is an unconstitutional restriction on ballot access. They further maintain that they permissibly relied upon the Initiative Guide and that enforcement of a statute that is inconsistent with the Initiative Guide violates due process. And they contend that the Secretary of State should be estopped from requiring compliance with a statute that the Initiative Guide did not include. Each of these contentions is addressed below.
 

 
 *682
 

 The affidavits do not satisfy NRS 295.0575
 

 To determine whether the statute was met by the affidavits in this case, we must first decide whether they were required to strictly comply with NRS 295.0575 or whether substantial compliance was sufficient. Once the appropriate standard is established, then this court must consider whether the affidavits met the required standard.
 

 Substantial compliance is the appropriate standard
 

 The proponents argue that substantial compliance is sufficient. The Secretary of State applied a strict compliance standard initially but concedes on appeal that substantial compliance is the correct standard. Of the other opponents, only the Nevada State Education Association argues on appeal for a strict compliance standard. The district court applied a substantial compliance standard without discussion, concluded that the affidavits were defective, and then noted that the affidavits would necessarily fail a strict compliance standard.
 

 In
 
 Nevadans for Nevada
 
 v.
 
 Beers,
 

 [29]
 

 this court recognized that a substantial compliance standard generally applies to statutory requirements. Moreover, this court has not before required strict compliance with a statutory requirement in the election context, instead looking for substantial compliance.
 
 [30]
 
 And a substantial compliance standard accords proper deference to the people’s initiative power.
 
 [31]
 
 We thus conclude that substantial compliance is the correct standard.
 

 The proponents bear the burden of establishing substantial compliance
 

 The Secretary of State determined that the affidavits did not satisfy the requirements of NRS 295.0575 because two of those requirements were wholly absent. As the parties challenging that determination, the proponents are properly allocated the burden of proving that the Secretary of State’s decision was incorrect,
 
 [32]
 
 that is, the proponents were required to demonstrate that they substan
 
 *683
 
 tially complied with the statute.
 
 [33]
 
 The burden is appropriately placed on the proponents in this case because they caused the situation when they failed to review the current statutes and comply with their requirements.
 

 The affidavits do not substantially comply with the statute
 

 The district court held that the affidavits did not substantially comply with NRS 295.0575 because they did not include two elements required by the. statute: the number of signatures and a statement that signers had the opportunity to review the measure’s full text before signing. The proponents assert that the statute’s purposes were adequately served by the information in the affidavits they provided and, thus, substantial compliance was achieved. The opponents contend that the failure even to attempt to include all elements means that substantial compliance was lacking.
 

 Nevada cases in the election context have recognized substantial compliance when a required element was present but was incomplete or supplied late. For example, in
 
 Springer
 
 v. Mount,
 
 [34]
 
 this court held that the statute requiring a certificate of candidacy to include the signers’ “address” was substantially complied with by partial addresses for some signers (street address but not city or town, or vice versa) because the purpose of the statute — permitting the clerk to determine whether the signer was a registered voter— was met. Similarly, in
 
 Cirac v. Lander County,
 

 [35]
 

 certain individuals who did not appear on the tax rolls, but who included sufficient information to permit a determination that they held land as community property with a spouse who did appear on the tax rolls, signed a petition to conduct a special election; this court held that substantial compliance was met, since it could be determined that all signers were taxpayers, as the statute required. And in
 
 Williams v. Clark County District Attorney,
 

 [36]
 

 substantial compliance was found when the statutory requirements were met, although six days late.
 

 In other contexts, the complete failure to meet a specific requirement was found not to constitute substantial compliance. For
 
 *684
 
 example, in
 
 Schofield
 
 v.
 
 Copeland Lumber,
 

 [37]
 

 this court held that a supplier failed to substantially comply with the mechanic’s lien statute because its notice to the property owner completely failed to include any information about the material terms of the supplier’s agreement with the contractor. This court noted the statute’s purpose of securing payment to those who furnish material, recognized the policy favoring liberal construction to effect this purpose, and recalled that
 

 [v]ery general statements of the terms, times given and conditions of a contract have been accepted as being in substantial compliance with the statute. However, we do not think that a notice of lien may be so liberally construed as to condone the total elimination of a specific requirement of the statute.
 
 [38]
 

 Thus, typically, failure to even attempt to comply with a statutory requirement will result in a lack of substantial compliance.
 

 In this vein, a number of cases from other jurisdictions hold that circulator affidavits that are missing statutorily required statements are defective. In
 
 Loonan v. Woodley,
 

 [39]
 

 the Colorado Supreme Court applied a substantial compliance standard but nevertheless found that circulators’ affidavits were defective because they did not include a statutorily mandated statement that the circulators had read and understood the laws governing the circulation of initiative petitions; accordingly, the initiative was ordered removed from the ballot. Similarly, an Illinois appellate court refused to permit a candidate to be placed on the ballot because he failed to comply with a requirement that the signature pages be numbered; the court noted that the candidate made no attempt to comply with the requirement and thus rejected his contention that he substantially complied by submitting sufficient signatures, referencing its prior holding “that a candidate does not substantially comply with the requirements where he completely ignores one of the statutory elements.”
 
 [40]
 
 In a New York case,
 
 Esse v.
 
 Chiavaroli,
 
 [41]
 
 the court
 
 *685
 
 struck a petition when the circulator’s affidavit failed to set forth the number of signatures gathered, as required by statute. And two Ohio cases invalidated petitions for the defects similar to the defects present in this case: the failure to include the number of signatures
 
 [42]
 
 and the failure to include a statement that the circulator believes that signers signed with knowledge of the measure’s contents.
 
 [43]
 

 Despite the abundance of authority recognizing that substantial compliance cannot exist when there is a complete failure to address a particular statutory requirement, the proponents rely heavily on this court’s opinion in
 
 Redl v. Secretary of
 
 State
 
 [44]
 
 for their argument that the affidavits substantially comply with NRS 295.0575, even though two of the required elements are totally absent.
 
 [45]
 

 Redi
 
 involved a writ petition challenging the Secretary of State’s decision to revive a long-defunct corporation, even though the list of officers and directors filed as part of the corporation’s revival application included only officers, and no directors.
 
 [46]
 
 The Secretary of State nevertheless accepted the documents and granted the revival application. This court noted that substantial compliance was achieved by “compliance with essential matters necessary to ensure that every reasonable objective of the statute is met.’ ’
 
 [47]
 
 Then,
 
 *686
 
 this court concluded that the Secretary of State did not manifestly abuse his discretion in determining that the necessary information for revival had been presented.
 
 [48]
 
 The proponents claim that the
 
 Redi
 
 holding applies equally in the instant case and that their failure to include two items does not mean that substantial compliance is lacking.
 

 We conclude, however, that substantial compliance in this instance requires the proponents to have at least attempted to satisfy each element in the statute. In particular, the two elements added in 2007 were deemed by the Legislature to provide additional protection against fraud to those requirements that were already in place. While the statute’s legislative history does not tie specific provisions to specific testimony, it seems reasonable to infer that the requirement to state the number of signatures obtained was designed to prevent fraud such as that described by committee hearing testimony of a “signature party” at Lake Mead, during which circulators traced signatures from one petition to another, by requiring the circulator to state, at the time the signatures are turned in, the number of signatures the circulator obtained, so that additional signatures are not later added to the document. Also, the requirement that each signer be given the opportunity to review a measure’s full text serves the purpose of ensuring that signers know what they are supporting. Moreover, neither of these purposes is met by the other requirements in the statute — that the circulator personally circulated the document and saw the signatories sign it — and thus, these elements appear to be “essential matters.” Therefore, in contrast to
 
 Redi,
 
 where the purpose of the statute at issue was served by the list of officers, even though directors were not included at the time, here, NRS 295.0575’s objectives were not met by the proponents’ partial compliance. Consequently,
 
 Redi
 
 is not controlling. Also, to hold that the complete absence of these elements sufficed for substantial compliance would render their inclusion in the statute nugatory — thus violating a basic principle of statutory construction.
 
 [49]
 
 We therefore conclude that, since the reasonable purposes of NRS 295.0575 were not met by the proponents’ compliance with only some portions of the statute, their affidavits did not substantially comply with that statute’s requirements.
 

 The proponents did not otherwise establish substantial compliance
 

 At oral argument before this court, the proponents pointed to two items in the record that they asserted demonstrated substantial
 
 *687
 
 compliance, or at least the existence of other evidence showing substantial compliance, with the second and fourth statutory requirements: an affidavit from the Chief Executive Officer of the company overseeing the signature-gathering and an “offer of proof” made to the district court. Arguably, evidence referred to in the affidavit could have shown substantial compliance with the second requirement’s number of signatures term if the proponents had attempted and were permitted to introduce it. Also, while we agree that the Secretary of State was not compelled to order verification of signatures with defective affidavits, had a sufficient number of signatures been verified, the purpose of that provision of the statute would perhaps have been adequately met to satisfy substantial compliance.
 
 [50]
 
 Moreover, we have previously recognized the importance of protecting the people’s initiative power,
 
 [51]
 
 and such a result would have comported with the policy of permitting the people to vote on issues of public importance, when procedural requirements are substantially met. But we need not decide that question here, however, because neither of the identified items suffices to show substantial compliance with the fourth requirement.
 

 To show substantial compliance with the fourth requirement, the proponents had to convince the district court that the petition circulators gave a sufficient number of signers the opportunity to read each initiative’s text before signing the petition.
 
 [52]
 
 The affidavit of the Chief Executive Officer of the corporation that hired the circulators for these petitions fails to demonstrate that each signer actually had an opportunity to read the text because it reveals only the company’s practices and the procedures that each circulator was expected to follow, not how each circulator actually obtained the signatures. Moreover, because the affidavit does not state that the Chief Executive Officer accompanied each circulator when gathering the signatures, it fails to show that he has any personal knowledge of those events and therefore would be competent to attest to such facts.
 
 [53]
 
 Accordingly, the affidavit contains no indicia of substantial compliance with the fourth requirement.
 

 
 *688
 
 Also, the proponents pointed to a purported “offer of proof” made during the district court hearing. At that time, the district court asked the proponents what remedy would be appropriate if it determined that the affidavits were invalid. In response, the proponents’ counsel stated that the court “could” require them to submit new affidavits that strictly complied with the statutory requirements — in essence, affidavits that averred to the number of signatures collected and that each signer had an opportunity to read the initiative’s text. According to counsel, although obtaining the new affidavits “would be difficult” and likely impossible as to some circulators, the proponents “probably” could get enough new affidavits corresponding to sufficient signatures to place the initiatives on the ballot. Indeed, counsel noted, they were already in the process of obtaining such affidavits.
 

 The proponents’ suggested solution did not show substantial compliance with the fourth requirement for several reasons. First, the proponents failed to proffer any evidence or witness testimony to support their assertion that the circulators gave the signers an opportunity to read the initiative’s text. Offers of proof are intended to (1) fully disclose to the court and opposing counsel the nature of evidence offered for admission, but rejected, and (2) preserve the record for appellate review.
 
 [54]
 
 But, as we have noted before, “[a]n offer of proof obviously is not a proper substitute for the tender of evidence which has never been presented and ruled upon.”
 
 [55]
 
 Since the proponents failed to proffer any evidence as to the circulators’ actual acts, their “offer of proof” was inappropriate.
 

 Further, the proponents’ counsel’s statement to the district court was no more than counsel’s speculation as to what the circulators might aver; thus, it did not constitute a proper offer of proof. Offers of proof must be specific and definite; counsel’s mere conjecture as to what the evidence might reveal does not suffice.
 
 [56]
 
 We
 
 *689
 
 have repeatedly advised against speculating as to the nature and substance of proffered evidence.
 
 [57]
 

 Here, the proponents stated only that they were in the process of obtaining new affidavits that would comply with NRS 295.0575. They gave no definite details as to what the circulators would have testified to or whether, and how many, circulators would have been able to attest to having given signers an opportunity to read the initiatives’ full texts. Accordingly, the proponents failed to make a proper offer of proof to address the opportunity to review requirement in NRS 295.0575(4). To the extent that the proponents sought additional time to gather such evidence, given the speculative nature of whether the proponents would be able to obtain relevant testimony as to the signers’ opportunity to read the text and the narrow time frame in which the district court had to resolve the matter, the court did not abuse its discretion in refusing to grant the proponents additional time to make their case.
 
 [58]
 
 Thus, the proponents failed to meet their burden to show substantial compliance with the second and fourth requirements of NRS 295.0575.
 

 Striking the signatures was the proper remedy in this case
 

 This court has repeatedly held that when an affidavit is defective, the signatures are properly stricken.
 
 [59]
 
 Also, many courts in
 
 *690
 
 other jurisdictions have reached the same conclusion.
 
 [60]
 
 The proponents, however, assert that since NRS 295.0575 does not specify a remedy for noncompliance, striking the signatures was improper. In light of this ample authority, the proponents’ argument lacks merit.
 

 The proponents also rely on the legislative history of NRS 295.0575, which was passed as part of A.B. 604, to argue that striking the signatures was not the proper remedy. In particular, the proponents point to statements by Assemblyman Marcus Conklin expressing concern with the idea of wholesale signature-striking.
 
 [61]
 
 But Assemblyman Conklin’s comments related to a provision contained in a companion bill, A.B. 606, not A.B. 604.
 
 [62]
 
 Moreover, later statements by Assemblyman Conklin indicate that he approved the language;
 
 [63]
 
 this language was not included when portions of A.B. 606 were incorporated into A.B. 604 and A.B. 606, as a separate bill, was abandoned.
 
 [64]
 
 This isolated and equivocal legislative history does not mandate that this court reverse its decades-long practice, followed in other states as well, of striking signatures based on invalid circulator affidavits.
 
 [65]
 

 And the proponents do not suggest any other remedy, except for their expressed hope that, if they had more time, they might
 
 *691
 
 have been able to obtain additional evidence of compliance. As discussed in the previous section, however, this speculation was insufficient. Striking the signatures is therefore the appropriate remedy.
 

 NRS 295.0575 is constitutional
 

 The proponents assert that even if their affidavits failed to substantially comply with NRS 295.0575, that statute cannot be enforced here because to do so would violate their constitutional rights. In so arguing, the proponents raise First Amendment and substantive due process challenges to NRS 295.0575 (although the latter challenge is not articulated as such). They first contend that the statute poses a severe burden on core political speech and thus must withstand strict scrutiny to be valid under the First Amendment, and they assert that the stated goals of the statute may be met by less restrictive means. Even under the more lenient flexible balancing test, they argue, the statute fails because it is not a reasonable restriction on First Amendment rights. They next contend that the statute is unconstitutional as applied in this case because the Initiative Guide was misleading; essentially, they argue that enforcing the statute in these circumstances violates substantive due process. They maintain that any inconsistency in the governing laws must be construed in their favor, thus allowing the measure to appear on the ballot.
 

 First Amendment challenge
 

 In
 
 Meyer
 
 v.
 
 Grant,
 

 [66]
 

 the United State Supreme Court considered a First Amendment challenge to a Colorado statute making it a felony to pay an initiative circulator. The Court began its discussion by noting that the circulation of an initiative petition necessarily “involves both the expression of a desire for political change and a discussion of the merits of the proposed change,” and thus, “the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as ‘core political speech.’”
 
 [67]
 
 The Court noted that the statute had the effect of “restricting] access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication.”
 
 [68]
 
 The Court thus concluded that, in light of the burden on protected speech, strict scrutiny was the appropriate standard.
 
 [69]
 
 Unsurprisingly, the Court struck down
 
 *692
 
 the criminal penalty, noting that the state’s asserted interest in the “integrity of the initiative process” was adequately met by other measures.
 
 [70]
 

 By the time the Court decided
 
 Buckley v. American Constitutional Law Foundation, Inc.,
 

 [71]
 

 11 years later, Colorado had passed several new statutes related to ballot initiatives, three of which the Court struck down: (1) a requirement that circulators be registered voters, (2) a requirement that they wear a name badge while soliciting signatures, and (3) a requirement that an initiative proponent report the names and addresses of, and the amount paid to, each paid circulator.
 
 [72]
 
 The Court began its discussion by citing
 
 Meyer
 
 for the proposition that petition circulation is core political speech because it involves interactive communication concerning political change, but then noted that substantial regulation of elections is necessary for a fair, honest, and ordered democratic process.
 
 [73]
 

 The proponents in
 
 Buckley
 
 challenged six provisions of Colorado law, three of which had been upheld by the Tenth Circuit and three of which had been stricken. Those that were upheld included a requirement that the circulator sign an affidavit with his or her name, address, and a statement that the circulator has read and understands the laws governing petition circulation.
 
 [74]
 
 In affirming the Tenth Circuit’s decision to strike down three of the requirements, the Court applied a strict scrutiny test after determining that these restrictions posed a severe burden on speech.
 
 [75]
 
 Notably, in determining that less restrictive means were available to serve Colorado’s asserted interests in administrative efficiency, fraud detection, and informing voters, the Court repeatedly pointed to the circulator affidavit requirement as a permissible means of meeting those objectives.
 
 [76]
 

 This court addressed whether to apply strict scrutiny or a less exacting flexible balancing test in
 
 Citizens for Honest Government v. Secretary of State,
 

 [77]
 

 in which this court considered a First Amendment challenge to the statutory 60-day time period for circulating a recall petition. This court relied on a 1992 United States Supreme Court opinion,
 
 Burdick v. Takushi,
 

 [78]
 

 and applied a “flexible balancing test” rather than strict scrutiny:
 

 
 *693
 
 A court considering a challenge to a state election law must weigh “the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate” against “the precise interests put forward by the State as justifications for the burden imposed by its rule,” taking into consideration “the extent to which those interests make it necessary to burden the plaintiffs rights.”
 
 [79]
 

 This court determined that when the restrictions are reasonable and nondiscriminatory, then the state’s important regulatory interests generally suffice to justify them.
 
 [80]
 

 Similarly, two years ago in
 
 Nevadans for Property Rights v. Secretary of State
 

 [81]
 

 (Property
 
 Rights), this court considered which test to apply in determining whether NRS 295.009’s single-subject requirement was constitutional. This court relied on a Tenth Circuit opinion,
 
 Campbell
 
 v. Buckley,
 
 [82]
 
 discussing Colorado’s single-subject requirement, for the proposition that when “the overall quantum of speech is reduced,” strict scrutiny applies, but when “nondiscriminatory regulations of the voting process that do not place direct limitations on the quantity of speech available” are at issue, the more flexible balancing test applies.
 
 [83]
 

 A recent Ninth Circuit case,
 
 Lemons v.
 
 Bradbury,
 
 [84]
 
 also offers guidance. In
 
 Lemons,
 
 the Ninth Circuit rejected referendum proponents’ argument that strict scrutiny applied to Oregon’s signature verification process simply because the right to vote was implicated, quoting the United States Supreme Court: “Plaintiffs’ argument ‘proceeds from the erroneous assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny.’”
 
 [85]
 
 But under U.S. Supreme Court jurisprudence, the Ninth Circuit pointed out, strict scrutiny applies only when the right to vote is severely restricted; reasonable, nondiscriminatory restrictions are generally supportable based on the state’s interest in regulating its own elections.
 
 [86]
 

 Here, the circulator affidavit merely requires the circulator to make available a copy of the initiative’s full text to any potential signer who wishes to review it and, after signatures have been
 
 *694
 
 gathered, to count them and sign an affidavit with the circulator’s statement that he or she personally circulated the document and that the signatures were affixed in his or her presence, the total number of signatures gathered, and that the signers had an opportunity to review the measure’s full text before signing. It does not restrict the overall quantum of speech, and it is nondiscriminatory and reasonable. Accordingly, the flexible balancing test, not strict scrutiny, applies.
 

 Applying the flexible balancing test requires this court to weigh the restriction imposed by the circulator affidavit requirement against the interests asserted by the State to be served by it. The Sixth Circuit has pointed out that this inquiry is fact intensive: the party challenging the restriction must present evidence showing how it burdens speech, and the state must demonstrate the interests served by it.
 
 [87]
 

 Regarding the burdens imposed by the statute, the proponents offered little evidence in the district court of how providing an opportunity for signers to review an initiative’s full text, ensuring that the document is signed in the circulator’s presence, and counting signatures burden speech, simply asserting that what constitutes an “opportunity” to review the full text could be difficult for a circulator to determine. We note that the record reflects that the proponents of several other initiatives were apparently able to comply with the statute’s requirements.
 

 As for the State’s interest, according to the statute’s legislative history, the affidavit requirement, among other amendments passed by the 2007 Legislature, was primarily intended to prevent fraud in the signature-gathering process.
 
 [88]
 
 Several individuals testified regarding this issue; specific to Nevada, one witness read a sworn affidavit into the record describing a “signature party” held at a Lake Mead picnic area, attended by over 100 people, at which circulators were tracing signatures from one initiative petition to another.
 
 [89]
 
 Another witness identified an emergent “initiative industrial complex,” in which a great deal of money is made by companies that bring in out-of-state circulators who are paid on a per-signature basis.
 
 [90]
 
 Also, some concern was expressed that signers be aware of what measures they were supporting.
 
 [91]
 
 The specific items in the affidavit were calculated to address these concerns.
 

 
 *695
 
 A comparison to two of the restrictions struck down by the United States Supreme Court in
 
 Buckley,
 
 as well as those noted with apparent approval, is instructive in determining whether the affidavit required by NRS 295.0575 passes constitutional muster. One of the Colorado statutes required that all circulators be registered voters; another required the circulators to wear badges with their names. The Court noted testimony in the record that requiring circulators to be registered voters severely reduced the number of people available to gather signatures.
 
 [92]
 
 Also, others stated that they had been harassed when gathering signatures on controversial measures and thus would not serve as circulators if they were required to wear name badges.
 
 [93]
 
 The Court acknowledged the reduced pool of potential circulators resulting from both restrictions, as well as the intimidation inherent in the name-badge requirement, in determining that those two restrictions were too severe.
 
 [94]
 
 On the other hand, while the Court had accepted review only of the measures stricken by the Tenth Circuit (which the Court affirmed), it implicitly approved the Tenth Circuit’s decision to uphold other requirements, including a circulator affidavit requirement: “In contrast, the affidavit requirement upheld by the District Court and Court of Appeals, which must be met only after circulators have completed their conversations with electors, exemplifies the type of regulation for which [a previous Supreme Court case] left room.”
 
 [95]
 
 In light of this precedent, we conclude that NRS 295.0575’s affidavit requirement does not violate the First Amendment.
 

 Enforcement of NRS 295.0575 in this instance does not violate substantive due process
 

 The proponents nevertheless contend that application of NRS 295.0575 is unconstitutional in this instance because of the allegedly misleading form in the Initiative Guide. They argue that the Secretary of State had a statutory duty to prescribe forms for the initiative process, that he failed to perform this duty when he did not update the Initiative Guide, and that the resulting inconsistency amounts to a substantial burden on political speech. It appears, however, that the crux of this claim is more accurately characterized as substantive due process rather than an as-applied First Amendment challenge: “Generally, substantive due process analysis applies when state action is alleged to unreasonably restrict an
 
 *696
 
 individual’s constitutional rights.”
 
 [96]
 
 A substantive due process claim is premised on the Fourteenth Amendment’s due process clause.
 
 [97]
 

 For their argument that the statute is unenforceable in this instance, the proponents rely on two federal district court decisions concerning requirements that voters provide photo identification when voting.
 
 [98]
 
 In
 
 Common Cause/Georgia League of Women
 
 v.
 
 Billups,
 

 [99]
 

 a number of voters and nonprofit organizations challenged Georgia’s newly adopted 2006 Photo ID Act and accompanying regulations, which went into effect less than three weeks before a primary election.
 
 [100]
 
 The Georgia Secretary of State had aired some public service announcements about the photo ID requirement for voting at the primary election and had prepared a letter to be distributed to voters explaining the new act, but the letter was to be distributed
 
 at
 
 the primary election polling locations, not in advance so that voters were aware of the new requirements in time to obtain photo ID.
 
 [101]
 
 (The law provided that a voter photo ID was available without cost at several locations.) The federal district court held that a preliminary injunction was appropriate to bar enforcement of the photo ID requirement at the primary election but specifically declined to rule on whether it might be enforceable at future elections, after additional voter education efforts.
 
 [102]
 

 The federal district court in
 
 American Civil Liberties Union v.
 
 Santillanes
 
 [103]
 
 perceived a slightly different problem with enforcement of an Albuquerque city charter amendment requiring photo ID for municipal elections.
 
 [104]
 
 In that case, the city clerk, charged with overseeing municipal elections, was unable to articulate a standard for what constituted a “valid” form of photo ID.
 
 [105]
 
 At her deposition, she testified that it would essentially be the onsite election official’s “call” as to whether, for example, a recently ex
 
 *697
 
 pired driver’s license was “valid” or if a particular photo looked enough like the voter.
 
 [106]
 
 Based on the lack of any standards and the consequent serious burden on voters, coupled with the city’s failure to assert an interest that would warrant a photo ID requirement, the district court permanently enjoined enforcement of the charter amendment.
 
 [107]
 

 Here, the proponents argue that, like Georgia in
 
 Common Cause,
 
 the Secretary of State did not sufficiently publicize the 2007 legislative amendments because they were not included in the Initiative Guide, and like the city clerk in
 
 Santillanes,
 
 the Secretary of State’s enforcement of NRS 295.0575 was arbitrary and capricious because of the asserted inconsistency between the Initiative Guide and NAC 293.182, on one hand, and NRS 295.0575, on the other.
 

 But the Initiative Guide specifically warned its readers, in bold type, that it did not have the force of law, directed its readers to review the most recent legislative amendments because the statutes were changed every legislative session, and, in the page preceding the forms appendix, noted that the 2007 legislative enactments were not reflected in the Initiative Guide because they had not yet been codified. Moreover, the statutory amendments were easily available from the Legislative Counsel Bureau, as noted in the Initiative Guide, for several months before the proponents filed their petitions and, as noted above, proponents of several other initiatives were able to access and comply with the statute. The confusion present in
 
 Common Cause,
 
 arising from the necessity of advising the entire voting population of Georgia of the need for a photo ID to vote less than three weeks before a primary election, does not appear in this case. Also, unlike the city clerk in
 
 Santillanes,
 
 who was unable to provide a clear, definitive standard, the Secretary of State’s Initiative Guide in this case specifically informed readers where to obtain controlling information.
 
 [108]
 
 Ac
 
 *698
 
 cordingly, enforcement of the statute is not barred by substantive due process.
 

 The Secretary of State is not equitably estopped from enforcing NRS 295.0575
 

 The proponents assert that they justifiably relied on the Initiative Guide and therefore the Secretary of State should be estopped from enforcing NRS 295.0575. The opponents maintain that equitable estoppel does not apply against the government, and moreover, the elements of equitable estoppel are not satisfied in this case.
 

 Equitable estoppel consists of the following elements: (1) the party to be estopped must be apprised of the true facts, (2) that party must intend that his conduct shall be acted upon or must so act that the party asserting estoppel has the right to believe it was so intended, (3) the party asserting estoppel must be ignorant of the true state of the facts, and (4) the party asserting estoppel must have detrimentally relied on the other party’s conduct.
 
 [109]
 
 Generally, equitable estoppel “ ‘does not apply against the state in matters affecting governmental or sovereign functions.’ ”
 
 [110]
 

 In
 
 Foley
 
 v.
 
 Kennedy,
 
 this court refused to apply equitable estoppel to an assistant registrar of voters’ statement during a telephone call to a recall campaign representative, regarding the number of signatures necessary for a valid petition to recall a university regent.
 
 [111]
 
 This court concluded that the constitution established the number of signatures necessary for a recall election and that the assistant’s statement could not be used to require an election that would be illegal under the constitution’s plain terms.
 
 [112]
 
 This court also noted that the regent had nothing to do with the assistant’s misinformation, and thus estoppel could not be applied against her, a blameless party.
 
 [113]
 

 
 *699
 
 More recently, in
 
 Attorney General v. Nevada Tax Commission,
 

 [114]
 
 this court refused to apply estoppel to prevent the Attorney General from pursuing Open Meeting Law violations by the Tax Commission. Besides pointing out that a deputy attorney general had advised the Commission that it was exceeding the permissible scope of a closed session, and thus it could not rightly claim ignorance of the true state of the law, this court emphasized that “estoppel cannot prevent the state from performing its governmental functions,” there, the Attorney General’s statutory duty to enforce the Open Meeting Law.
 
 [115]
 

 A review of this court’s opinions in which estoppel was applied against the government is instructive. In the 1980 case of
 
 Nevada Public Employees Retirement Board v. Byrne,
 

 [116]
 

 this court differentiated between a government official’s representations of a factual nature and those expressing estimates or opinion. The former type of statements could form the basis for estoppel, while the latter could not. In
 
 Byrne,
 
 a state employee, after communicating with the retirement board regularly over a four-year period, relied on the retirement board’s representations concerning what his monthly pension payment would be if he retired after a certain date.
 
 [117]
 
 After the employee retired, the board informed him that his payment would be one-tenth of what had been represented; this amount was later revised to about two-thirds of the original representation.
 
 [118]
 
 This court concluded that the retirement board’s representations were factual in nature and thus estoppel would apply to require payments in the amount represented to the employee.
 
 [119]
 

 Similarly, in
 
 Southern Nevada Memorial Hospital v. State,
 

 [120]
 

 this court applied equitable estoppel to prevent the state from revoking letters of approval to two hospitals for construction and expansion. One hospital had applied for permission to expand its bed capacity, and the other had sought approval for construction of an acute-care hospital. The state issued letters of approval that contained a time limit for when work on the requested projects must proceed. The hospitals began construction and the state then sought to revoke the letters. This court held that the state was estopped from revoking the letters when the hospitals had justifiably relied on them.
 
 [121]
 

 
 *700
 
 In both of those cases, the government was estopped after having made factual representations specific to the person seeking information about a particular situation, who then relied on the representations in commencing a course of action. Here, the proponents did not rely on any factual representation by a representative of the Secretary of State that was specific to them, or indeed, any factual representation at all. The Initiative Guide was a general reference document that was not specific to any particular petition. Moreover, any reliance on this document, to the exclusion of the current statutes, was not reasonable, as the Guide contained clear disclaimers urging interested persons to contact the Legislative Counsel Bureau for the most recent statutory provisions. Finally, as in
 
 Attorney
 
 General, the Secretary of State is engaged in his statutory duty: to enforce Nevada’s election laws.
 
 [122]
 
 Thus, equitable estoppel is not available to the proponents in this case.
 
 [123]
 

 CONCLUSION
 

 We affirm the district court’s decision in Docket No. 52045 to disqualify all three initiatives based on the circulators’ failure to substantially comply with NRS 295.0575’s affidavit requirement. We affirm in part the district court’s decision in Docket Nos. 51509 and 51564, since the LVCVA permissibly participated in the court actions challenging the initiative petitions. We decline to address the remaining issues in Docket Nos. 51509 and 51564, and we dismiss the appeal in Docket No. 51639, as they are rendered moot by our decision today.
 

 [2]
 

 The LVCVA also receives a relatively small portion of its revenue from operating the Convention Center and the Cashman Center.
 

 [3]
 

 While each initiative provides that it applies to all Nevada counties with populations greater than 800,000, only Clark County currently fits that description. Also, according to a population projection in the record, Washoe County’s population is approximately 400,000 at this time and is not expected to pass the 800,000 threshold for at least 20 years, and, according to counsel’s representation at the district court hearing, possibly as long as 50 years.
 

 [4]
 

 Nev. Const. art. 4, § 18(2).
 

 [5]
 

 Secretary of State
 
 v.
 
 Burk,
 
 124 Nev. 579, 588-89, 188 P.3d 1112, 1118-19 (2008).
 

 [6]
 

 Under NRS 354.474, the LVCVA is a local
 
 government
 
 entity, since it was formed pursuant to NRS Chapter 244A. The LVCVA does not contest this characterization. We consider only whether the LVCVA was properly permitted to participate in the circulator affidavit litigation because our disposition renders the remaining issues, in which the other local governments participated, moot.
 

 [7]
 

 118 Nev. 488, 50 P.3d 546 (2002),
 
 overruled in part on other grounds by Garvin
 
 v.
 
 Dist. Ct.,
 
 118 Nev. 749, 765 n.71, 59 P.3d 1180, 1190 n.71 (2002).
 

 [8]
 

 Id.
 
 at 491, 50 P.3d at 548.
 

 [9]
 

 Id.
 

 [10]
 

 Id.
 

 [11]
 

 Id.
 
 at 492, 50 P.3d at 548.
 

 [12]
 

 Id.
 
 at 492-93, 50 P.3d at 549.
 

 [13]
 

 S.B. 123, 72d Leg. (Nev. 2003) (as introduced).
 

 [14]
 

 2003 Nev. Stat., ch. 179, § 1, at 925-26. The statute was moved in 2007 to the newly created NRS Chapter 281 A, governing Ethics in Government, and is now codified at NRS 281A.520.
 
 See
 
 2007 Nev. Stat., ch. 195, § 18, at 641.
 

 [15]
 

 See, e.g., Silvera
 
 v.
 
 EICON,
 
 118 Nev. 105, 109, 40 P.3d 429, 431-32 (2002).
 

 [16]
 

 The parties cite cases from other jurisdictions in support of their positions, but none of those cases concern similar facts or a similar statute; accordingly, we find them unpersuasive and have not discussed them in the text. Specifically, the LVCVA cites to cases discussing a local government’s standing to
 
 *680
 
 challenge an initiative,
 
 but none
 
 mentions any funding prohibition.
 
 See City of Burbank v. Airport
 
 Authority, 6 Cal. Rptr. 3d 367 (Ct. App. 2003);
 
 City of San Diego v. Dunkl,
 
 103 Cal. Rptr. 2d 269 (Ct. App. 2001);
 
 City of Sequirn v.
 
 Malkasian, 79 P.3d 24 (Wash. Ct. App. 2003);
 
 see also Village of Chatham v. County of Sangamon,
 
 814 N.E.2d 216 (Ill. App. Ct. 2004) (concerning a challenge to a legislative classification, not a ballot initiative, and discussing only standing). The initiatives’ proponents cite to cases that identify some restrictions on public funds spent to campaign for or against a measure, but none that discusses funds spent on a court challenge.
 
 See Stanson v. Mott,
 
 551 P.2d 1 (Cal. 1976);
 
 Anderson
 
 v.
 
 City of Boston,
 
 380 N.E.2d 628 (Mass. 1978);
 
 Citizens to Protect Pub. Funds
 
 v.
 
 Board of Education,
 
 98 A.2d 673 (N.J. 1953).
 

 [17]
 

 See
 
 NRS 295.009-.061.
 

 [18]
 

 NRS 295.012.
 

 [19]
 

 See
 
 NRS 293.12756-. 12795.
 

 [20]
 

 NRS 295.056(1);
 
 see also
 
 NRS 293.12758.
 

 [21]
 

 NRS 295.0575.
 

 [22]
 

 NRS 293.1276(1).
 

 [23]
 

 NRS 293.1276(2).
 

 [24]
 

 NRS 293.1277(1).
 

 [25]
 

 NRS 293.1277(2). In some instances, when random sampling indicates that a measure has between 90 and 100 percent of the necessary signatures, the Secretary may direct the county clerk to verify all signatures. NRS 293.1279(2).
 

 [26]
 

 NRS 293.1278.
 

 [27]
 

 NRS 293.1279.
 

 [28]
 

 NRS 293.12793; NRS 293.12795(3).
 

 [29]
 

 122 Nev. 930, 142 P.3d 339 (2006).
 

 [30]
 

 Eller Media Co.
 
 v.
 
 City of Reno,
 
 118 Nev. 767, 59 P.3d 437 (2002);
 
 Williams v. Clark County Dist. Attorney,
 
 118 Nev. 473, 50 P.3d 536 (2002);
 
 Cirac v. Lander County,
 
 95 Nev. 723, 602 P.2d 1012 (1979);
 
 Cleland v. District Court,
 
 92 Nev. 454, 552 P.2d 488 (1976);
 
 Springer
 
 v.
 
 Mount,
 
 86 Nev. 806,
 
 477
 
 P.2d 159 (1970).
 

 [31]
 

 Beers,
 
 122 Nev. at 945, 142 P.3d at 349;
 
 Nevadans for Prop. Rights v. Sec’y of State,
 
 122 Nev. 894, 912, 141 P.3d 1235, 1247 (2006);
 
 Rogers
 
 v.
 
 Heller,
 
 117 Nev. 169, 178, 18 P.3d 1034, 1041 (2001).
 

 [32]
 

 Anderson
 
 v.
 
 Poythress, 211
 
 S.E.2d 834, 836 (Ga. 1980).
 

 [33]
 

 See
 
 id.; Fabec
 
 v.
 
 Beck,
 
 922 P.2d 330, 342-43 (Colo. 1996) (noting that opponents’ burden to justify their objection to circulators’ affidavits was met by showing that a discrepancy in an affidavit’s date resulted in uncertainty as to whether the affidavit was actually signed before the notary, and thereafter, the proponents bore the burden of demonstrating substantial compliance).
 

 [34]
 

 86 Nev. 806, 477 P.2d 159 (1970).
 

 [35]
 

 95 Nev. 723, 602 P.2d 1012 (1979).
 

 [36]
 

 118 Nev. 473, 50 P.3d 536 (2002).
 

 [37]
 

 101 Nev. 83, 692 P.2d 519 (1985).
 

 [38]
 

 Id. at 85, 692 P.2d at 520 (internal citation omitted);
 
 see also Engleman v. Royal Insurance Co.,
 
 56 Nev. 319, 51 P.2d 417 (1935) (holding that an insured’s utter failure to file a proof of loss with the insurer did not substantially comply with the policy’s requirement that a proof of loss be filed).
 

 [39]
 

 882 P.2d 1380 (Colo. 1994).
 

 [40]
 

 El-Aboudi
 
 v.
 
 Thompson,
 
 687 N.E.2d 1166, 1168 (Ill. App. Ct. 1997) (citing
 
 Jones
 
 v.
 
 Dodendorf,
 
 546 N.E.2d 92, 94 (Ill. App. Ct. 1989));
 
 accord Bowe
 
 v.
 
 Chicago Electoral Bd.,
 
 404 N.E.2d 180 (Ill. 1980) (invalidating petitions when circulator failed to have affidavit notarized);
 
 Schumann v. Kumarich,
 
 430 N.E.2d 99 (Ill. App. Ct. 1981) (holding that nominating petitions were invalid when circulators’ affidavits were missing required information, including the circulator’s address, a statement that those signing were registered voters, and a statement that the signers’ addresses were correct).
 

 [41]
 

 420 N.Y.S.2d 798 (App. Div. 1979).
 

 [42]
 

 State ex rel. Loss v. Bd. of Elections of Lucas County,
 
 281 N.E.2d 186 (Ohio 1972).
 

 [43]
 

 State
 
 v.
 
 Bachrach,
 
 193 N.E.2d 517 (Ohio 1963).
 

 [44]
 

 120 Nev. 75, 85 P.3d 797 (2004).
 

 [45]
 

 The proponents rely on some out-of-state authority as well, but three of the four cases cited do not support their position; the final case’s import is unclear. In
 
 Feldmeier v. Watson,
 
 123 P.3d 180 (Ariz. 2005), the proponents of a city charter amendment initiative petition were held to have substantially complied with a requirement that the circulator’s affidavit state that the circulator believes the signatures to be those of qualified electors, when the affidavits included this language but did not specify that they were electors of the “City of Prescott”; notably, the statute did not require the affidavits to state a particular location. Here, the proponents’ affidavits are missing statements specifically required by statute. The two California cases cited by the proponents,
 
 Ruiz
 
 v.
 
 Sylva,
 
 125 Cal. Rptr. 2d 351 (Ct. App. 2002), and
 
 California Teachers’ Association v. Collins,
 
 34 P.2d 134 (Cal. 1934), both involved technical noncompliance — in
 
 California Teachers,
 
 the type was 12-point instead of 18-point and the title was about 25 words long instead of 20, and in
 
 Ruiz,
 
 some type that should have been in bold was normal or underlined. These two cases, then, involve quite different shortcomings than those present here. Finally, the proponents also cite to a 2006 Missouri Supreme Court opinion,
 
 Committee for a Healthy Future
 
 v.
 
 Carnahan,
 
 201 S.W.3d 503 (Mo. 2006), in which the court concluded that an initiative would not be stricken based on “incomplete” circulator affidavits when a sufficient number of signatures had actually been verified. But the opinion does not indicate in what way these affidavits were “incomplete,” and thus its holding cannot be applied to the facts of this case without knowing what was missing from the Missouri affidavits. The case is therefore unpersuasive.
 

 [46]
 

 Redl,
 
 120 Nev. at 77, 85 P.3d at 798.
 

 [47]
 

 Id.
 
 at 81, 85 P.3d at 800-01 (internal citation omitted).
 

 [48]
 

 Id.
 
 at 81-82, 85 P.3d at 801.
 

 [49]
 

 See, e.g., Paramount Ins. v. Rayson & Smitley,
 
 86 Nev. 644, 649, 472 P.2d 530, 533 (1970) (recognizing that courts should interpret a statute to avoid rendering any language nugatory).
 

 [50]
 

 See Carnahan,
 
 201 S.W.3d 503 (refusing to strike signatures based on incomplete circulators’ affidavits when sufficient signatures to place the measure on the ballot had been actually verified; notably, the precise nature of why the affidavits were “incomplete” is not stated in the opinion, however).
 

 [51]
 

 Nevadans for Nevada v. Beers,
 
 122 Nev. 930, 945, 142 P.3d 339, 349 (2006);
 
 Nevadans for Prop. Rights
 
 v.
 
 Sec’y of State,
 
 122 Nev. 894, 912, 141 P.3d 1235, 1247 (2006).
 

 [52]
 

 We note that because the proponents did not even attempt to introduce evidence regarding the signers’ opportunity to review the full text, we do not decide whether this requirement could have been met by adducing such evidence after the fact.
 

 [53]
 

 See generally Saka
 
 v.
 
 Sahara-Nevada Corp.,
 
 92 Nev. 703, 705, 558 P.2d 535, 536 (1976) (recognizing that, for summary judgment purposes, affidavits
 
 *688
 
 must be based on “the affiant’s personal knowledge, and there must be an affirmative showing of his competency to testify to them’ ’ (discussing NRCP 56(e))).
 

 [54]
 

 Morrison
 
 v.
 
 Air
 
 California, 101 Nev. 233, 237, 699 P.2d 600, 603 (1985);
 
 see also
 
 75 Am. Jur. 2d
 
 Trial
 
 §§ 353, 354 (2007).
 

 [55]
 

 Southern Pac. Transp. Co. v. Fitzgerald,
 
 94 Nev. 245, 246, 579 P.2d 1251, 1252 (1978).
 

 [56]
 

 See Kim v. Mercedes-Benz, U.S.A., Inc.,
 
 818 N.E.2d 713, 719 (Ill. App. Ct. 2004),
 
 opinion modified on reh’g,
 
 (2004) (“ ‘An offer of proof that merely summarizes the witness’ testimony in a conclusory manner is inadequate. Neither will the unsupported speculation of counsel as to what the witness
 
 *689
 
 would say suffice.’ ” (quoting
 
 People v. Andrews,
 
 588 N.E.2d 1126, 1131-32 (Ill. 1992)));
 
 Terry
 
 v.
 
 Mossie,
 
 59 S.W.3d 611, 612-13 (Mo. Ct. App. 2001) (recognizing that it is difficult for counsel to make an effective narrative offer of proof, since the offer of proof cannot be “a ‘mere statement of the conclusions of counsel,’ ” but must specifically and definitely establish what the evidence will be, its purpose and object, and its admissibility (quoting
 
 Kinzel
 
 v.
 
 West Park Investment Corporation,
 
 330 S.W.2d 792, 796 (Mo. 1959)));
 
 Milenkovic v. State,
 
 272 N.W.2d 320, 326 (Wis. Ct. App. 1978) (“An offer of proof need not be syllogistically perfect but it ought to enable a reviewing court to act with reasonable confidence that the evidentiary hypothesis can be sustained and is not merely an enthusiastic advocate’s overstated assumption.”).
 

 [57]
 

 Burgeon
 
 v.
 
 State,
 
 102 Nev. 43, 47, 714 P.2d 576, 579 (1986) (citing
 
 Van Valkenberg
 
 v.
 
 State,
 
 95 Nev. 317, 594 P.2d 707 (1979));
 
 see also La-Tex Partnership
 
 v.
 
 Deters,
 
 111 Nev. 471, 477-78, 893 P.2d 361, 366 (1995).
 

 [58]
 

 Although the district court’s determination was based on its conclusion that any new affidavits could not cure the defects, we will affirm the district court if it reaches the right result, even when it does so for the wrong reason.
 
 See Albios v. Horizon Communities, Inc.,
 
 122 Nev. 409, 426 n.40, 132 P.3d 1022, 1033 n.40 (2006).
 

 [59]
 

 Secretary of State v. Give Nevada A Raise,
 
 120 Nev. 481, 484, 96 P.3d 732, 733 (2004);
 
 Stumpf v. Lau,
 
 108 Nev. 826, 839 P.2d 120 (1992),
 
 overruled
 
 
 *690
 

 in part on other grounds by Herbst Gaming, Inc., v. Sec’y of State,
 
 122 Nev. 877, 888, 141 P.3d 1224, 1231 (2006);
 
 Lundberg
 
 v.
 
 Koontz,
 
 82 Nev. 360, 418 P.2d 808 (1966);
 
 Fiannaca
 
 v.
 
 Gill,
 
 78 Nev. 337, 372 P.2d 683 (1962);
 
 Caton Et. Al. v. Frank,
 
 56 Nev. 56, 44 P.2d 521 (1935).
 

 [60]
 

 Loonan
 
 v.
 
 Woodley,
 
 882 P.2d 1380 (Colo. 1994);
 
 Bowe v. Chicago Electoral Bd.,
 
 404 N.E.2d 180 (Ill. 1980);
 
 El-Aboudi v. Thompson,
 
 687 N.E.2d 1166 (Ill. App. Ct. 1997);
 
 Schumann
 
 v.
 
 Kumarich,
 
 430 N.E.2d 99 (Ill. App. Ct. 1981);
 
 Esse
 
 v.
 
 Chiavaroli,
 
 420 N.Y.S.2d 798 (App. Div. 1979);
 
 State ex rel. Loss v. Bd. of Elections of Lucas County,
 
 281 N.E.2d 186 (Ohio 1972);
 
 State v. Bachrach,
 
 193 N.E.2d 517 (Ohio 1963);
 
 see also Taxpayers Action Network v. Sec. of State,
 
 795 A.2d 75 (Me. 2002) (stating that the secretary of state has the authority to invalidate a petition when circulators did not comply with statutory requirements);
 
 In re Initiative Petition No. 379,
 
 155 P.3d 32 (Okla. 2006) (striking signatures with noncompliant circulators’ affidavits).
 

 [61]
 

 Hearing on A.B. 604 Before the Assembly Comm, on Elections, Procedures, Ethics, and Constitutional Amendments, 74th Leg. (Nev., April 5, 2007) (discussing with former District Judge Michael Griffin possible remedies for when fraud in signature-gathering is shown).
 

 [62]
 

 Id.
 

 [63]
 

 Hearing on A.B. 606 Before the Senate Comm, on Legislative Operations and Elections, 74th Leg. (Nev., May 10, 2007) (advocating passage of the bill when it was being considered by the Senate).
 

 [64]
 

 Hearing on A.B. 604 Before the Senate Comm, on Legislative Operations and Elections, 74th Leg. (Nev., May 17, 2007).
 

 [65]
 

 See Silvera v. EICON,
 
 118 Nev. 105, 109, 40 P.3d 429, 431-32 (2002) (stating that when the Legislature has had the opportunity to change the law as interpreted by this court and does not do so, it is presumed that this court’s interpretation accurately reflects legislative intent).
 

 [66]
 

 486 U.S. 414 (1988).
 

 [67]
 

 Meyer,
 
 486 U.S. at 421-22.
 

 [68]
 

 Id.
 
 at 424.
 

 [69]
 

 Id.
 
 at 425.
 

 [70]
 

 Id.
 
 at 426-27.
 

 [71]
 

 525 U.S. 182 (1999).
 

 [72]
 

 Buckley,
 
 525 U.S. at 186.
 

 [73]
 

 Id.
 
 at 186-87.
 

 [74]
 

 Id.
 
 at 188-89.
 

 [75]
 

 Id.
 
 at 192 n.12.
 

 [76]
 

 Id.
 
 at 196, 198-99, 205.
 

 [77]
 

 116 Nev. 939, 11 P.3d 121 (2000).
 

 [78]
 

 504 U.S. 428 (1992).
 

 [79]
 

 Id.
 
 at 434 (quoting
 
 Anderson
 
 v.
 
 Celebrezze,
 
 460 U.S. 780, 789 (1983)).
 

 [80]
 

 Citizens, 116 Nev. at 645, 11 P.3d at 125.
 

 [81]
 

 122 Nev. 894, 141 P.3d 1235 (2006).
 

 [82]
 

 203 F.3d 738 (10th Cir. 2000).
 

 [83]
 

 Property Rights,
 
 122 Nev. at 904, 141 P.3d at 1242.
 

 [84]
 

 538 F.3d 1098 (9th Cir. 2008).
 

 [85]
 

 Id. at 1103 (quoting
 
 Burdick
 
 v.
 
 Takushi,
 
 504 U.S. 428, 432 (1992)).
 

 [86]
 

 Id.
 

 [87]
 

 Citizens for Tax Reform v. Deters,
 
 518 F.3d 375 (6th Cir. 2008).
 

 [88]
 

 Hearing on A.B. 604 Before the Assembly Comm, on Elections, Procedures, Ethics, and Constitutional Amendments, 74th Leg. (Nev., April 5, 2007).
 

 [89]
 

 Id.
 

 [90]
 

 Id.
 

 [91]
 

 Id.
 

 [92]
 

 Buckley v. American Constitutional Law Foundation, Inc.,
 
 525 U.S. 182, 193-94 (1999).
 

 [93]
 

 Id.
 
 at 197-98.
 

 [94]
 

 Id.
 
 at 195, 200.
 

 [95]
 

 Id.
 
 at 200 (citing
 
 McIntyre v. Ohio Elections Comm’n,
 
 514 U.S. 334 (1995) (striking down Ohio’s ban on distributing anonymous campaign literature)).
 

 [96]
 

 Mont. for Justice v. State ex rel. McGrath,
 
 146 P.3d 759, 767 (Mont. 2006).
 

 [97]
 

 Id.
 

 [98]
 

 We note that these cases’ viability is somewhat in question in light of the United States Supreme Court’s recent opinion in
 
 Crawford v. Marion County Election Board,
 
 553 U.S. 181 (2008), which upheld Indiana’s photo ID requirement, but we nevertheless discuss them in the text because (hey were not directly impacted by the
 
 Crawford
 
 opinion and because their analyses may be helpful in the resolution of this case.
 

 [99]
 

 439 F. Supp. 2d 1294 (N.D. Ga. 2006).
 

 [100]
 

 Common Cause,
 
 439 F. Supp. 2d at 1346.
 

 [101]
 

 Id.
 

 [102]
 

 Id.
 
 at 1360.
 

 [103]
 

 506 F. Supp. 2d 598 (D. N.M. 2007).
 

 [104]
 

 Santillanes,
 
 506 F. Supp. 2d at 605-06.
 

 [105]
 

 Id.
 
 at 617.
 

 [106]
 

 Id.
 

 [107]
 

 Id.
 
 at 646. Notably, the court distinguished the record in the case before it from that presented to the Seventh Circuit in the
 
 Crawford
 
 case, concerning Indiana’s photo ID requirement, which was later affirmed by the U.S. Supreme Court.
 
 See id.
 
 at 637-38 (citing
 
 Crawford v. Marion County Election Bd.,
 
 472 F.3d 949, 953-54 (7th Cir. 2007)).
 

 [108]
 

 Other cases, cited by the opponents, further illustrate the lack of any constitutional barrier to NRS 295.0575’s enforcement in this case.
 
 See Roe v. State of Ala. By and Through Evans,
 
 43 F.3d 574, 583 (11th Cir. 1995) (preliminarily enjoining a state court decision concluding that non-notarized, non-witnessed absentee ballots nevertheless substantially complied with statutory requirements when the decision overturned accepted past practice and evidence presented indicated that many potential voters did not vote because they could not vote in person and could not comply with notarization and witness requirements for absentee ballots);
 
 Griffin v. Burns,
 
 570 F.2d 1065, 1080 (1st Cir. 1978) (ordering a new primary election when, after absentee ballots had
 
 *698
 
 been advertised, provided, and used by many voters in a primary election, the Rhode Island Supreme Court determined that they were not permitted in a primary);
 
 Briscoe v. Kusper,
 
 435 F.2d 1046, 1055 & 1056 n.3 (7th Cir. 1970) (striking new, unannounced standards for signature verification in city aider-man nominating petitions but noting that requirements clearly imposed by the statute were enforceable).
 

 [109]
 

 Attorney General v. Nevada Tax Comm’n,
 
 124 Nev. 232, 237, 181 P.3d 675, 679 (2008).
 

 [110]
 

 Foley
 
 v.
 
 Kennedy,
 
 110 Nev. 1295, 1302, 885 P.2d 583, 587 (1994) (quoting
 
 Green v. Osborne,
 
 758 P.2d 138, 140 (1988) (other internal citations omitted));
 
 see also Attorney General,
 
 124 Nev. 232, 181 P.3d 675.
 

 [111]
 

 Foley,
 
 110 Nev. at 1295, 885 P.2d at 583.
 

 [112]
 

 Id.
 
 at 1302-03, 885 P.2d at 587.
 

 [113]
 

 Id.
 

 [114]
 

 124 Nev. 232, 181 P.3d 675.
 

 [115]
 

 Id.
 
 at 238, 181 P.3d at 679.
 

 [116]
 

 96 Nev. 276, 607 P.2d 1351 (1980).
 

 [117]
 

 Id.
 
 at 278, 607 P.2d at 1352.
 

 [118]
 

 Id.
 
 at 279, 607 P.2d at 1352-53.
 

 [119]
 

 Id.
 
 at 280, 607 P.2d at 1353-54.
 

 [120]
 

 101 Nev. 387, 705 P.2d 139 (1985).
 

 [121]
 

 Id.
 
 at 393, 705 P.2d at 143.
 

 [122]
 

 NRS 293.124(1) (“The Secretary of State shall serve as the Chief Officer of Elections for this State. As Chief Officer, the Secretary of State is responsible for the execution and enforcement of the provisions of title 24 [Elections] of NRS and all other provisions of state and federal law relating to elections in this State.”).
 

 [123]
 

 Cf. Schumann v. Kumarich,
 
 430 N.E.2d 99 (Ill App. Ct. 1981) (holding that circulators of a nominating petition for community college trustees could not rely on estoppel to prevent striking of petition based on defective affidavits when the circulators had obtained the form from the community college).